# Illinois Official Reports

## Appellate Court

---

### *In re An. W.*, 2014 IL App (3d) 130526

---

| | |
|---|---|
| Appellate Court Caption | *In re* An. W., As. W., L.G., and E.J., Minors (The People of the State of Illinois, Petitioner-Appellee, v. Christine W. and Robert G., Respondents-Appellants). |
| District & No. | Third District<br>Docket Nos. 3-13-0526, 3-13-0527, 3-13-0528, 3-13-0529, 3-13-0549, 3-13-0550, 3-13-0551, 3-13-0552 cons. |
| Filed | September 3, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In proceedings on juvenile petitions alleging that respondents' minor children were neglected and/or abused, the trial court's findings that the allegations were true and that the respondents were dispositionally unfit were upheld over respondents' contentions that the factual findings on which the neglect determinations were based were against the manifest weight of the evidence, since the testimony of the children provided corroboration for the allegations made in the petitions and supported the trial court's determinations. |
| Decision Under Review | Appeal from the Circuit Court of Will County, Nos. 11-JA-154, 11-JA-155, 11-JA-156, and 12-JA-16. |
| Judgment | Affirmed. |

Counsel on
Appeal

Robert Lorz, of Shorewood, for appellant Christine W.

Neil J. Adams, of Joliet, for appellant Robert G.

James Glasgow, State's Attorney, of Joliet (Richard T. Leonard
(argued), of State's Attorneys Appellate Prosecutor's Office, of
counsel), for the People.

Edward P. Graham, of Law Offices of Edward P. Graham, of
Naperville, guardian *ad litem*.

Panel

JUSTICE CARTER delivered the judgment of the court, with opinion.
Justice O'Brien concurred in the judgment and opinion.
Justice McDade specially concurred, with opinion.

**OPINION**

¶ 1    The State filed juvenile petitions alleging that the minor children, An. W., As. W., L.G., and E.J., were neglected and/or abused and seeking to make the children wards of the court. After hearings, the trial court found that the children were neglected and/or abused and that the children's parents, Christine W. and Robert G., were dispositionally unfit. The children were made wards of the court and the Department of Children and Family Services (DCFS) was named the children's guardian. Christine and Robert appeal, challenging both the finding of neglect and/or abuse and the determination of parental unfitness. We affirm the trial court's judgment.

¶ 2                                    FACTS

¶ 3    In December 2011 and January 2012, the State filed juvenile petitions seeking to adjudicate the minors, Ar. W. (born in 1994), D.J. (born in 1995), L.G. (born in 1996), E.J. (born in 1997), As. W. (born in 2002), and An. W. (born in 2006), neglected and/or abused and to make the minors wards of the court. The petitions alleged that all of the children had been subjected to an injurious environment (either directly or by way of anticipatory neglect) and that some of the children had been abused.[1] The petitions stemmed from allegations that respondent-father, Robert, had sexually molested Ar. W., D.J., and L.G. for several years and that there had been domestic violence in the family home between Robert and respondent-mother, Christine, Robert's wife. The parent-child relationships in this case were

_____

[1]The petitions for Ar. W. and D.J. are not contained in the record before us. For the purpose of providing the factual background of this appeal, we have assumed that those petitions were similar to the petitions of the other children.

somewhat complicated: the youngest children, An. W. and As. W., were the biological son and daughter of Robert and Christine; Ar. W. was the biological daughter of Christine and the stepdaughter of Robert; and D.J., E.J., and L.G. were the biological sons and daughter of Robert and Lakeesha J. and the stepsons and stepdaughter of Christine. In addition, Robert had numerous other children, some of whom were also mentioned in the record. During the lengthy proceedings in this case, both Ar. W. and D.J. turned 18, and the juvenile petitions were dismissed as to them. Lakeesha eventually stopped showing up for the proceedings and she was defaulted after it was determined that her whereabouts were unknown.

¶ 4       An adjudicatory hearing in the present case was held over several days in October 2012 and March 2013. At the hearing, the State did not call the children to testify. Rather, the State admitted three exhibits: a copy of the indicated reports of DCFS for this case, a written stipulation as to the testimony of the DCFS investigator, and a copy of the victim sensitive interviews (VSIs) of Ar. W., D.J., and L.G. The evidence presented in those exhibits can be summarized as follows.

¶ 5       The State's first exhibit consisted of approximately 143 pages of DCFS reports regarding the current allegations, which resulted in a finding of "indicated" made against Robert and Christine relating to the incidents of alleged sexual abuse. The reports established that the current allegations came to light in November 2011 when Lakeesha, who was in a residential alcohol treatment center, told her treatment providers that her daughter, L.G., had been caught doing prostitution; that she was concerned about L.G.; and that when she discussed the matter with L.G., L.G. told her that her father, Robert, had sexually molested her and her siblings for several years. The treatment providers reported the matter to DCFS and DCFS investigated the allegations.

¶ 6       As part of the investigation, DCFS child protection investigator Gina Kitakis interviewed the children, one at a time, at their schools or at the DCFS office. Most of the interviews took place within a day or two of the allegation coming to light, except for the interview of E.J., who was not learned of or located until later. In her interview, L.G., a 15-year-old female, told Kitakis that her father, Robert, had sexually molested her numerous times for several years going as far back as she could remember. Robert had put sexual devices in her vagina, had touched her, and had done sexual things to her on a nightly basis. Some of L.G.'s siblings had witnessed the abuse. Robert had also forced L.G. to have vaginal sex with her brother, D.J., and had been sexually molesting L.G.'s stepsister, Ar. W. The last time L.G. was molested by Robert was when she was seven years old. L.G. had reported the abuse on previous occasions but would always recant her story because Robert would give her money or other things or would tell her that he would let her go live with her mother, Lakeesha, and because she was afraid. L.G. told her stepmother, Christine, about the abuse, but Christine did not believe L.G. or did not do anything to stop the abuse. L.G. told Kitakis further that Robert had recently been telling her that he loved her more than he should. L.G. had been attempting to prostitute herself but that was of her own doing and was not because Robert had sent her out to do so. L.G. had lived with her 41-year-old uncle, Rodney L. (Rodney), for a period of time and had sex with him about six times during that period. C.J., one of L.G.'s older sisters, had been staying with L.G., was being supportive, and was helping L.G. to be strong.

¶ 7       D.J., a 16-year-old male, told Kitakis in his interview that he struggled with telling on his father, Robert, because he loved Robert and wanted Robert to get help. D.J. stated that

Robert had made him have sex with L.G. and Ar. W. almost every night while he was growing up. Robert would make D.J. put his penis in the vagina of Ar. W. or L.G and would make D.J. perform oral sex on them. Sometimes, D.J. would put his penis to the side of the girls' vaginas to try to fool Robert. The sexual abuse started when D.J. was about eight years old and continued until just recently. D.J. stated further that Robert had brought him to a hotel where he believed that Robert had sex with a 14-year-old girl. D.J. could hear Robert and the girl in the bathroom moaning in a sexual way. According to D.J., after DCFS came over to the house the previous day, Robert called everyone on their cell phones and offered them money to lie at the VSIs.

¶ 8    In her interview, Ar. W., a 17-year-old female, told Kitakis that her stepfather, Robert, had sexually molested her numerous times from when she was little up until last year. Robert told Ar. W. that doing so gave him a "high." In addition, Robert would make Ar. W.'s stepbrother, D.J., put his penis in her vagina while Robert watched. During those incidents, D.J. would try to put his penis to the side of Ar. W.'s vagina so that Robert could not tell if it was going in or not. The last incident of sexual abuse occurred in 2010 when Ar. W. asked Robert for money so that she could get a hotel room with her 16-year-old female partner. Robert went to the hotel with them, stayed in the room, put on porn, and paid them to have oral sex with each other in front of him. Robert then performed oral sex on Ar. W. and her partner. Ar. W. told Kitakis that on previous occasions, she would report the abuse, but that she would eventually recant because Robert would give her money.

¶ 9    As. W., a nine-year-old female, told Kitakis in her interview that she was scared of her father, Robert, because he hit her mother, Christine, and made Christine cry a lot. Robert had also stated curse words to Christine and had choked Christine. Robert had not touched As. W. in a sexual way, but he had hit As. W., had grabbed her, and had torn her shirt. On one occasion, As. W. saw Robert touch the butt of her sister, L.G. L.G. did not want Robert to do that and Robert gave L.G. what As. W. thought was $100.

¶ 10    In his interview, An. W., a five-year-old male, told Kitakis that he had not been touched sexually by his father, Robert, or by anyone else. An. W. had, however, seen Robert hit his mother, Christine, and that made An. W. sad. An. W. stated further that Robert would hit him as well and would use a belt or his hands to do so. At times, the belt would hit An. W. in the face and head. An. W. also saw Robert put his hands around Christine's neck in what An. W. demonstrated as a choking motion.

¶ 11    In addition to interviewing the children, Kitakis spoke to C.J., the adult sibling whom L.G. had mentioned. C.J. told Kitakis that she was the biological daughter of Robert and Lakeesha and that she had seen Robert sexually abusing her sister countless times at night in several different homes that they had lived in. C.J. had witnessed firsthand Robert sexually abusing L.G. and Ar. W. and stated that Robert had also made her brother, D.J., do things to the two girls as well. On one occasion growing up, Robert had touched C.J.'s chest at night when he had mistaken C.J. for L.G. According to C.J., all of the siblings used to sleep in one bed to try to protect each other. C.J. had been encouraging her siblings to talk to the police and to DCFS about the sexual and physical abuse in the home. Robert, however, was a good manipulator and would give the children money to change their story. Robert would also tell the children that if they told anyone about the abuse, he would stop paying for all of the bills, that he would go to Mexico, and that he would leave them with nothing. C.J. stated that her

- 4 -

stepmother, Christine, had been abused by Robert and that Christine knew about the sex abuse of the children.

¶ 12    Kitakis checked for previous reports of sexual abuse and determined that there were several previous reports involving L.G. and Ar. W, which were determined to be unfounded. During those previous investigations, L.G. and Ar. W. made outcries of sexual abuse and then recanted. Because of concerns as to L.G.'s credibility, Kitakis decided to attempt to interview Christine and Robert. Upon arriving at Christine's apartment, Kitakis saw a large hole in the big screen television, which Christine stated was from a fight between her and Robert. Christine stated further that she had never witnessed any sexual abuse and that she had no idea that Robert was abusing the girls or their brother sexually. Christine was crying at the time and stated that the children had told her but had later stated that it was a lie.[2] Christine told Kitakis that she believed the children's allegations now. Christine stated further that she was a victim of domestic abuse by Robert, that he was very controlling, that he hit her a lot, including at times in front of the children, and that he had made her do "freaky sexual things" with his brother.

¶ 13    Kitakis noted in her report that she had witnessed the VSIs of L.G., D.J., and Ar. W. and provided a summary in her report of what the children had said. Kitakis noted later in her report that C.J. had obtained an order of protection for the children and had given her a copy. At that time, C.J. told Kitakis that Christine stayed in the car at the courthouse and decided not to get an order of protection for herself because she wanted to go back to Robert.

¶ 14    Later in December 2011, C.J reported to Kitakis that Christine was telling the children in the car on the way to the DCFS office to recant their story because Robert would buy them things and would get them an apartment to live in. C.J. stated that the children were now going to recant because they wanted Robert to buy them things. According to C.J., that was the cycle that continued to occur and was why the children had made so many outcries but had not followed through with the truth–they were bribed by Robert and persuaded by Christine to change their story. C.J. told Kitakis that she was supportive of the children and that she knew that the sexual abuse was true because she had witnessed it firsthand.

¶ 15    When Kitakis met with Christine at the DCFS office to discuss the safety plan, Christine stated that she still worked with Robert at his business, but that Robert had not been around to see the children. When Kitakis talked to Christine about the domestic violence in the home that Christine had previously admitted, Christine minimized the domestic violence and stated that it had only gotten physical one time. Christine told Kitakis that she did not believe that Robert had sexually molested the children and that she believed that the children were lying. Christine stated further that she was thinking of getting a divorce, but she did not think that Robert should be away from his children.

¶ 16    After the comments by Christine, Kitakis decided to take protective custody of the children to maintain their safety. Protective custody was taken as to all of the children, except E.J., in December 2011. When Kitakis told the children that she was taking protective custody of them, the children huddled up in front of Kitakis and her supervisor and talked

---

[2]Although not part of the indicated reports, a report by the caseworker in December 2012 noted that Christine told the caseworker that when the allegations of sexual abuse against Robert arose in 2006, Christine reported the allegation to the police, took the children and resided elsewhere, and did not return home until after the children had recanted the allegations.

- 5 -

about now telling DCFS that they had lied so that DCFS would not take the children away from Christine. The children decided that they would go to court and lie to the judge so that the judge would send them home.

¶ 17    A short time later, Kitakis spoke to D.J.'s counselor at the treatment center where D.J. was receiving inpatient treatment for drug use. The counselor told Kitakis that D.J. had stated during a session that he would see Robert sexually molesting his sister and his stepsister at night. When Robert became aware that D.J. had seen him, Robert would beat D.J. with anything he could find to hit him with. D.J. had also stated that on occasions, Robert would make him have sex with his sister or his stepsister while Robert watched. The sexual abuse occurred for many years up until about six months ago. The counselor had also heard D.J. on the phone with his siblings telling his siblings to tell the judge that their allegations were not true because they did not want to be separated.

¶ 18    At a shelter care hearing in court on December 21, 2011, Kitakis learned that Robert had another child, E.J., a 14 year-old-male, who was the biological son of Robert and Lakeesha.[3] E.J. was living with an aunt and uncle, the same uncle who had allegedly had sexual intercourse with L.G. About a month later, after Kitakis had ascertained the whereabouts of E.J., she interviewed him at his school. E.J. told Kitakis that he was currently living with his aunt Stacy and uncle Rodney and had not lived in the family home for the past two years. When Kitakis told E.J. why she was there, E.J. stated that he had no idea that his siblings were in DCFS care. E.J. told Kitakis that no one had sexually abused him. E.J. stated, however, that he was aware of the allegations of sexual abuse in Robert's home but had not witnessed it firsthand. E.J. told Kitakis that all of the children got bad "whoopins" from Robert and that there was domestic violence in the home between Robert and Christine. E.J. stated further that he had learned from both L.G. and his aunt Stacy that his uncle Rodney had sex with L.G. last year. E.J.'s aunt told E.J. that she knew about it because she saw "dirty" text messages that Rodney had left on L.G.'s phone. In addition, anytime someone in the family fought with Rodney they would throw it in Rodney's face that he had slept with L.G. E.J. stated that his aunt felt that it was L.G.'s fault that Rodney had sex with her. After the interview, in January 2012, Kitakis took protective custody of E.J.

¶ 19    In the State's next exhibit, the written stipulation, the parties stipulated to the testimony of Kitakis. The written stipulation was essentially a more consolidated version of the statements that the children and Christine had made to Kitakis. Although the parties stipulated as to what Kitakis would testify, they did not stipulate as to the truth of that testimony or as to the credibility of the statements that had allegedly been made to Kitakis by the children or Christine.

¶ 20    The State's final exhibit was a copy of the VSIs of D.J., Ar. W. and L.G. In his VSI, D.J. told the interviewer that his father, Robert, had sexually molested him, his sister, L.G., and his stepsister, Ar. W. The abuse had gone on almost every night for several years, had occurred at every place in which they lived, and had just stopped recently. D.J.'s older sister, C.J., had seen some of the abuse occur. The children all slept in the same room, and Robert would take the girls to another room when he was going to molest them. The children had

_____

[3]Although not contained in the indicated reports, the trial court record and report of proceedings show that at some of the shelter-care hearings, Christine stipulated that there was ongoing domestic violence in the home and that there were allegations of sexual abuse against Robert.

come up with a routine of how they would sleep to try to prevent Robert from sexually molesting Ar. W. and L.G. During some of the incidents of abuse, D.J. had seen Robert put his mouth and fingers on or in Ar. W.'s vagina and had also seen Robert do the same to L.G. Robert had also tried to put his penis into L.G.'s vagina and had put a dildo into L.G.'s vagina. At times, Robert would have D.J. watch while Robert molested L.G. In addition, Robert would make D.J. have sexual intercourse with Ar. W. and, at times, would take D.J.'s penis and try to put it into Ar. W.'s vagina. Robert also made D.J. have sexual intercourse with L.G. while Robert watched. That occurred almost every night before D.J. reached puberty. D.J. told the interviewer that he and L.G. were not forced to do so, but they were scared to say no. D.J. commented further that Ar. W. did not like talking about the abuse or admitting that it had occurred. According to D.J., during some of the times when Robert was molesting one of the girls, he would get up and say something to Robert. When D.J. distracted Robert, Robert would take him into another room and beat him, but Robert would usually stop sexually molesting the girls for the rest of that night.

¶ 21    When D.J. and his siblings got in trouble, Robert would call them out to the garage in a specific order. Robert would give L.G. the choice of getting a "whoopin" or being sexually abused by Robert in the garage. In addition, on one occasion, Robert took D.J., his female cousin, and a 14-year-old girl named H. to a hotel. Robert and H. went into the bathroom and D.J. could hear them moaning in a sexual way.

¶ 22    D.J. stated that when the allegations of sexual abuse would come up, the children knew that they had complete control over Robert because Robert would get really shaky and would give the children money or buy them things to get them not to say anything about what had happened. In fact, Robert had just recently purchased D.J. a scooter. D.J. felt like he had gotten closer with Robert since Robert had stopped abusing the children and that they talked more.

¶ 23    According to D.J., his mother, Lakeesha, did not know about the sexual abuse. The children had told their stepmother, Christine, about the sexual abuse, and Christine had reported it to the police, but the children had later told Christine that they had lied about the sexual abuse. Further on in the interview, however, D.J. stated that his stepmother knew what was going on.

¶ 24    Ar. W. told the interviewer in her VSI that she, L.G., and D.J. were sexually molested by her stepfather, Robert. The abuse happened nightly from when Ar. W. was 7 or 8 years old until she was about 13. Robert would take whoever he was going to molest out of the children's bedroom. During the incidents of abuse with Ar. W., Robert would put his mouth, his hand, or his penis on or in Ar. W.'s vagina. Robert would also try to make D.J. put his penis into Ar. W.'s vagina while Robert watched, but D.J. would not do so. The sexual abuse involving D.J. only happened to Ar. W. one time. Robert never made Ar. W. touch him sexually. When Robert would molest Ar. W. at night, her stepsister, C.J., and her stepbrother, D.J., would usually wake up. At times, D.J. would walk into the room and Robert would stop what he was doing. Robert would then take D.J. to another room and beat him. The last time Robert molested Ar. W. was when she was about 14. Ar. W. denied during her interview that Robert had ever done anything sexual to a person with whom Ar. W. was in a relationship and told the interviewer that although her brother and her sisters may have said that, she was not going to make any comment about it.

¶ 25    Ar. W. had seen Robert sexually molest L.G. and had seen Robert try to put a sexual device into L.G.'s vagina. Ar. W. did not care about the abuse anymore and felt that it was stupid to bring the whole thing up now because the abuse was over with and had not occurred for the past three years. Ar. W. commented that there would be a lot of consequences and the children and Christine would have nowhere to go. According to Ar. W., Christine had put a lot of money into Robert's trucking business and that was all going to go away. Ar. W. was nervous and mad about what was going to happen but stated that what she told the interviewer was the truth.

¶ 26    In her VSI, L.G. told the interviewer that Robert had sexually molested her and some of her siblings. The sexual abuse would occur at night and Robert had told the children that they could not lock their bedroom doors, so the children came up with a pattern of how they would sleep on the floor with Ar. W. and L.G. in the center to protect the children that Robert would abuse the most. Robert used to rub Vaseline on L.G.'s vagina and would tell her that it was alright and that it was what she was supposed to do. In addition, Robert had tried in the past to put his penis in L.G.'s vagina and in her mouth. When Robert did so, his penis was hard, but he never ejaculated. At times when the abuse was occurring, L.G.'s brother, D.J., would wake up and would say something to Robert and the abuse would stop for the night. Robert would then beat D.J.

¶ 27    Robert also used to try to make L.G. and D.J. touch each other and would try to make D.J.'s penis go into L.G.'s vagina. Robert would angle D.J.'s penis so that it would go in, but D.J. would position it so that it would go on or by L.G.'s leg and not into her vagina. According to L.G., D.J.'s penis never went into her vagina, but it did go into Ar. W.'s vagina. Robert also used to make L.G.'s older sisters pull their underwear down, open their legs, and bend over. At one point, Robert tried to make L.G.'s brother, E.J., do something with one of the girls, but E.J. asked if he could just go watch television instead.

¶ 28    According to L.G., when Robert would punish her, he would give her the choice of a "whoopin" with the belt or for him to "touch on" her. If she picked the "whoopin," he would hit her all over with the metal part of the belt and then he would still "touch on" her later. Robert would tell L.G. that he loved her way more than he should and that he did not look at her like a daughter. In addition, Robert would pay L.G. money to touch on her. The last time Robert molested L.G. was when she was about 12. Robert asked if he could do stuff to L.G. when she was 15, but she said no. According to L.G., Robert was also having sex with L.G.'s friend, H., who was 14. L.G. had not seen Robert and H. have sex, but D.J. had seen them do so.

¶ 29    At one point, L.G. told her grandmother about the abuse and her grandmother hid L.G. at her aunt Stacy's and uncle Rodney's house. Robert eventually found her there. When they got home, Robert whipped L.G. for a long time on the legs with two belt buckles. L.G.'s whole leg was swollen as a result and she could not walk. She was about seven at the time. After that, L.G. stopped telling her grandmother because she knew that her grandmother would tell her father.

¶ 30    L.G. ended up having sexual intercourse with her uncle Rodney when she was 14 and he was 41 in her aunt's room and in a hotel room. She was in seventh grade at the time. They had sexual intercourse about seven times. L.G.'s aunt found out and believed that it was L.G.'s fault that the sexual relationship had occurred.

¶ 31 During her interview, L.G. stated that her stepmother, Christine, knew about everything that had happened because the children had told her, and L.G. did not like that Christine was pretending that she did not know. L.G. stated later in the interview that Christine knew about the abuse but that Christine did not want to say that she knew because Robert abused her too. According to L.G., DCFS told Christine that Robert could not be around the children, but Christine let Robert back into the house.

¶ 32 Robert had contacted L.G. by her cell phone and had asked her not to do this to him. Robert also contacted L.G.'s older sister to tell them that he would buy them a house if they did not say anything. The children recanted before because Robert had told them that he would let them go live with their mother, Lakeesha. According to L.G., Robert did not feel bad for what he had done because he felt that they were all going to die eventually and that he might as well make the best of it. L.G. felt that Robert should be arrested for what he had done and stated that everything she told the interviewer was the truth.

¶ 33 After the State rested its case, Christine was called to testify by her attorney. Christine testified that she currently lived in an apartment in University Park, Illinois, and that she had three biological children, As. W., who was 10; An. W., who was 6, and Ar. W., who was 17½. Christine had been married to Robert since 2006. Christine denied that in November 2011, L.G. told her that Robert had sexually molested her. Christine stated that she never had an opportunity to talk to L.G. about that particular allegation. Christine denied further that she made any statement to Kitakis about any damage to the big screen television and stated that Kitakis never asked her a question about the television. Christine stated further that she never told anyone that Robert abused her, that Robert was very controlling, or that Robert struck her. According to Christine, Robert had never pushed, struck, or restrained her, and the police had never been called regarding any allegation of physical abuse by Robert to her. In addition, Christine had never seen Robert abuse the children in any manner. Christine did, however, see Robert punish D.J. for stealing Robert's car. During her testimony, Christine acknowledged that Kitakis came to her apartment at the end of November 2011 and that there was a hole in the big screen television at that time. Christine maintained, however, that Kitakis never asked her about the television and that she never told Kitakis anything about the television. Christine acknowledged further that the children had made allegations of sexual abuse against Robert in the past.

¶ 34 Robert was also called to testify at the adjudicatory hearing by his attorney. Robert testified that he was currently living in Markham with his father. Prior to that time, Robert had lived with Christine in University Park, but at a different residence. Robert and Christine separated after they were kicked out of their residence because Robert's son, D.J., had been doing burglaries. According to Robert, Christine was tired of the things Robert's children were doing. Robert had two children with Christine, As. W. and An. W. In addition, Robert had several other children, including J.G., age 21; C.J., age 20; M., age 19; K.R., age 18; D.J., age 17; L.G., age 16; Jas., age 16; E.J., age 15, and Jam., age 9. Lakeesha was the mother of D.J., L.G., and E.J. According to Robert, he had never had any domestic violence issues with Christine since they had been married. Robert had never struck Christine and had never been investigated by the police for domestic violence. Robert denied that he put a hole in Christine's big screen television and said that from what he had heard, that hole happened when Christine moved into the apartment.

¶ 35    Robert denied that he had ever had any type of sexual contact of any manner with L.G., D.J., or Ar. W. Robert stated that the allegations of sexual abuse between him and his children had arisen three times. The allegation was started by Lakeesha. The first time was in Lafayette, Indiana, and they went through a court proceeding like the one in the present case. About a year later, in about 2007, after the court proceeding was over, the judge turned the children over to Robert. At that time, the children (J.G., C.J., D.J., and L.G.) told Robert that they were sorry and that they were just trying to get back to Lakeesha so that they could help her. About a year or two later, the allegation surfaced again in Cook County based upon a statement made by Lakeesha. After that case was finished, the children got placed back with Robert. After the second occasion, Robert spoke to D.J. about it and was again told that the children were just trying to go live with Lakeesha. D.J. told Robert that his rules were too strict, that Robert did not like his friends (who D.J. was breaking into houses with), and that Robert did not let D.J. do anything.

¶ 36    Robert owned his own business as a motor carrier and sent automobiles to other countries. He was very involved in the business and was gone a lot at the time that the sexual abuse allegations first started to surface. Each time the allegations arose, the children would eventually recant and state that they had lied, and would eventually be returned to Robert. Robert denied that he ever offered the children money to change their story and stated as to the instant case, "[t]hese people don't even allow me to walk with the kids to the washroom, let alone have time for a bribe."

¶ 37    According to Robert, at some point, Lakeesha came back to Illinois. Because the children wanted to help Lakeesha, Robert took Lakeesha to a rehabilitation center. For the first time in years, Lakeesha stayed clean for about three months. After Lakeesha went through the initial program, she went to a halfway house. Lakeesha was visiting with the children during that time period, and Robert was taking the children there to spend time with her. After Lakeesha got out of the rehabilitation center, the allegations of sexual abuse resurfaced.

¶ 38    Robert acknowledged that although he had never been arrested for domestic battery of Christine, he had been arrested for domestic battery in about September 2002. Robert stated that the allegations against him in the instant case were all lies–he did not hit Christine, he did not have sex with a 14-year-old girl, and he did not call the children and promise them money to change their story. The last time Robert lived with Christine was in about 2010, until the police put him out because D.J. had been doing burglaries. Robert had not lived with Christine since that time, but he had seen the children regularly on weekends.

¶ 39    In addition to Christine and Robert testifying, some of the children were called to testify under oath and *in camera* by their attorneys or guardians *ad litem* (GAL). L.G. testified that she was currently living at a treatment facility and was undergoing sexuality therapy and family therapy. L.G. stated that the she had never been sexually molested by her father, Robert, and that she and the other children had made up the whole story so that they could live with their biological mother, Lakeesha, and so that Robert would give or buy them stuff. The allegation against her stepmother, Christine, was also untrue. In fact, when L.G. and her siblings lied and told Christine that they had been sexually abused, Christine was the one who first called the police. L.G. acknowledged that the allegations of sexual abuse were very detailed but stated that she knew what to say because the children had practiced the story. According to L.G, she and her siblings, including C.J., had talked about the matter beforehand and knew what they were going to say and who was going to play what part.

When asked why C.J. would subject herself to criminal prosecution by signing a verified petition and getting an order of protection if the allegation was false, L.G. stated she did not know. L.G. stated further that she continued with the story of abuse at the treatment center because when she tried telling them that the story had been made up, they told her that she would just end up having to stay at the treatment center longer. L.G. acknowledged further that the allegations went back as far as 2006 and that this was the third time that the children had made allegations of sexual abuse against Robert and had then recanted. However, L.G. maintained during her *in camera* testimony that she had never been sexually molested by Robert or forced to have sexual intercourse with her brother.

¶ 40    D.J. testified under oath and *in camera* that he had completed inpatient drug treatment and that he was currently living with one of his older sisters. D.J. stated that the whole story of sexual abuse was false and that his father, Robert, never sexually abused his sister or his stepsister. D.J. stated further that the allegations regarding Robert forcing him to have sex with his sister and his stepsister were also untrue. D.J. and his siblings made the statements because they wanted to go live with their biological mother, Lakeesha, so that they could help her with her addiction problems. D.J. and his siblings had made up the allegations before and had seen that it had worked–they got to go live with their mother. At the time of the most recent allegations, D.J. was a drug addict and Robert was the strict type and wanted D.J. to focus on school and to get a job and did not really let D.J. go out. What Robert was doing was conflicting with D.J.'s ability to get drugs. D.J. knew that if he made the allegations, Robert would be out of the way. D.J. did not know, however, that all of the children would be taken from the home and that Robert would have to go to jail. D.J. and his siblings did not think it would get that serious because it did not get that serious when they made up the allegations in the past. D.J. and his siblings could not just ask Robert to let them live with Lakeesha because Robert knew of the severity of Lakeesha's addiction and would not let them go. D.J. and his siblings recanted the story because they saw that it was not going to get them back with their mother. In addition, after going through drug treatment, D.J. was able to think more clearly and realized that what they were doing was wrong.

¶ 41    As D.J.'s testimony was finishing up, he asked if his sister L.G. was present. The following conversation ensued.

> "[D.J.]: I wanted, [L.G.], she is here?
>
> MS. DRELL [D.J.'s attorney/GAL]: She is gone.
>
> [D.J.]: She is gone? We didn't even get to see her.
>
> MS. DRELL: They had to get back.
>
> [D.J.]: You serious. It is like, I am not saying that this is true, but it is like when you guys, okay, I could look back on the allegations that we said, you know, it looks as if like we were a strong family and we had to stick together. And then when we come try to get justice, we all go separated. If this was a true story, why wouldn't they recant?
>
> THE COURT: Excuse me?
>
> [D.J.]: If this was, the lies we told, if that were any other kid, I wouldn't blame them to recant because it is like we got into a worser [sic] situation.
>
> MR. PHILLIPS [Robert's attorney]: Because you got all separated?

[D.J.]: Right. Who wouldn't recant to try to get back with their brothers and sisters?

THE COURT: Are you telling me based on what you just said, that that is the reason you are recanting your story?

[D.J.]: No, I am not saying that. But when you look at the picture like that–

THE COURT: I am looking at [the] picture all right.

[D.J.]: What if this really had happened to some kids and then you separated them like that.

THE COURT: That is what I am thinking.

[D.J.]: This is not the case with us. But when you look at it like that, it is like oh, my gosh.

THE COURT: Right.

[D.J.] That is terrible. I am glad something like that really didn't happen to us.

THE COURT: It happened to your dad then, didn't it?

[D.J.]: Yes. And I feel so terrible for what we did, the lies we told. I mean, it angers me to know I didn't get to see my sister at all.

CASA: There was a sibling visit this past Saturday, correct, in which you saw [L.G.]?

[D.J.]: Yes. We want our sisters come home and not be institutionalized.

THE COURT: That is not happening today. Nothing is happening today. We are not done. We are not done. It is going to continue on for a while, yes. We are not through testimony yet.

MS. FILIPIAK [the prosecutor]: I have no more questions.

THE COURT: Now it works the judge's way, not your way.

[D.J.]: I know it's not going to work my way. But I wasn't expecting this injustice."

¶ 42     Ar. W. testified under oath and *in camera* that she was currently living with one of her older sisters/stepsisters. Ar. W. denied that she ever told Kitakis about any sexual abuse and stated that she did not know from where Kitakis got that information. According to Ar. W., none of the information that Kitakis provided was true. Ar. W. also denied that she made certain statements during her VSI. When questioned further about the statements, Ar. W. stated that she lied to try to help the other children to go live with their mother, that nothing was true, and that it was all about money at this point. According to Ar. W., the other children made up the story to try to get money from Robert and so that they would be allowed to live with their mother. The children thought if Robert got locked up, they would get all of the money from his business. Ar. W. claimed that she told the others not to do it, the others did not listen, and that was why they were stuck in this mess. According to Ar. W., the plan was to get Robert out of the way so the children could get the money from his business and could go with their mother. The plan did not work and instead of getting Robert out of the way, it got all of them out of the way.

¶ 43     Ar. W. stated that Robert treated her well and was a good stepfather. Robert also treated the other children well, even though they made the allegations of sexual abuse against him. Ar. W. stated further that their plan did not work and that was why they recanted several

times. According to Ar. W., there was no molestation; it was just lies. Ar. W. said that this was the first time that they were all removed from the home by DCFS and that was why they recanted. Ar. W. did not agree with what the others were doing but went along with them because they were her siblings.

¶ 44    At various times, while Ar. W. was being questioned, her testimony became somewhat strange or difficult to understand, as is demonstrated in the following testimony:

"MS. FILIPIAK [the prosecutor]: [Ar. W.], do you remember being at the children's advocacy center and giving a videotaped interview?

[AR. W.]: I think so.

MS. FILIPIAK: That is you in the video, right?

[AR. W.]: I don't know. I didn't see the video.

MS. FILIPIAK: But did you talk to a girl named Jackie?

[AR. W.]: I guess. I don't know. I don't remember.

MS. FILIPIAK: Are you okay?

[AR. W.]: No, I am having cramps right now.

MS. FILIPIAK: I am just going to ask, are you under the influence of anything right now?

[AR. W.]: No.

MS. FILIPIAK: You just seem very, I don't know how to describe it, just–

[AR. W.]: I am stressed out because of this. This is why drugs–

MS. FILIPIAK: I am sorry?

[AR. W.]: On drugs from this stuff. That is what I am drugged from. Tired from listening to this stupid stuff.

* * *

MR. PHILLIPS [Robert's attorney]: But to get the money, they had to get Robert out of the way?

[AR. W.]: Yes. But it didn't work. It got us out of the way. It is crazy. That is what they get for doing this. I never agreed to none of that. That video, whatever I said probably out of town. I got an idea. But then I changed my mind, didn't make sense. Wasn't going to work like that. And it is stupid and wrong getting somebody locked up for their money. Just plain stupid.

* * *

THE COURT: Were you around when they–after the second time that these allegations were made and they were home, were you around at that time?

[AR. W.]: Yes, I was around.

THE COURT: How did Robert treat you?

[AR. W.]: Good. Stepfather.

THE COURT: And them the same?

[AR. W.]: Yes, them the same.

THE COURT: Even though they made those horrendous allegations?

[AR. W.]: Yes. He didn't know what was going on with us like secretly because we kept it to ourselves. He didn't know that was the plan we was having for him. But

it didn't work. That is why we recanted like six times trying to do it. It didn't work. Nothing going on. No molestation. It was just lies. Got to find something like that to make a move. But we came, when we did this last time, it didn't work. We got tooken instead.

* * *

THE COURT: No. We want you to tell us the truth.

[AR. W.]: Is telling you the truth. There was nothing going on. It was just money. Did they record that when I was behind the thing?

THE COURT: I am sorry?

[AR. W.]: Did they record that part when they was recording me November 30th? Did you-all hear that?

THE COURT: I wasn't there.

MS. FILIPIAK: I don't believe there is anything in the tape about that this was a lie and was doing for money. If I recall the tape correctly, she says it did happen.

THE COURT: I thought you were talking–

[AR. W.]: That was the first time I was agreeing with them. That is what I am saying. Nothing happened. I don't recall saying something about my girlfriend meeting him. What? Shoot me in my head right now."

¶ 45 E.J. testified under oath and *in camera* that he was not initially involved in this case because he was not living at home and had instead been living with his aunt for the past three years. E.J. acknowledged that he told Kitakis that he had been told by his siblings about some sexual abuse allegations and that he also told Kitakis that he, his mother, and his siblings had all been hit by his father, Robert. E.J. stated during his testimony that he had heard about the sexual abuse but that he did not believe his siblings because they lied all of the time. E.J. stated that Robert hit the other children but did not hit him because he was the best child and listened to what Robert told him. E.J. stated that he never saw Robert hit his mother, but he knew that Robert "whooped" his brothers and sisters for the stuff that they did. E.J. never saw Robert hit his stepmother, Christine, either, but he knew that they verbally argued. E.J. would only visit the family home about once a month. E.J. stated that when he was in about 6th grade, he asked his aunt if he could move in with her because he and his cousin were best friends and wanted to go to school together. E.J.'s aunt agreed, and Robert let him go. After E.J. moved in with his aunt, all of his grades got better and he began doing sports and other activities. Because things were better for him at his aunt's house, E.J. was allowed to stay there.

¶ 46 E.J. acknowledged during his testimony that this was the third time that the allegations of sexual abuse had been brought against Robert. E.J. knew that the first two times, his siblings made the allegations so that they could go live with his (their) mom, Lakeesha. When he heard about the allegations this time around, he assumed that his siblings were trying to get back to his (their) mom and were "going to play [that] game again." When asked about how he felt about what his brothers and sisters were doing to Robert, E.J. stated that his brothers and sisters were bad kids; that he would always tell them that; and that if they were his kids, he would whip them "like serious." According to E.J., when he was little, Robert would talk to all of the children and would tell them all of the things not to do. E.J.'s siblings did exactly what they were told not to do, but E.J. listened to Robert and did not do those things. E.J.

- 14 -

stated that Robert's discipline approach was to talk to him and his siblings first and to tell them to get it through their heads. When they did not listen, Robert would say I told you so, and when the children would do something else on top of it, Robert would give them a "whoopin."

¶ 47    As. W. testified under oath and *in camera* that she was ten years old, was in third grade, and was currently living in foster care. According to As. W., when she was living at home, her mother, Christine, and her father, Robert, had lots of fights, almost every day, so As. W. would just go to her room. The fighting would make As. W. sad and she would cry. During the fights, Christine and Robert would throw stuff at each other, such as bottles and cans, and Robert would hit Christine. The fighting would make Christine upset and she would cry as well. As. W.'s little brother, An. W., would also be home sometimes when Christine and Robert would fight.

¶ 48    According to As. W., sometimes during the fighting, she would see Robert push Christine to the ground or hit Christine in the face with his fist. One time, Robert busted Christine's lip and blood started coming out of her mouth. As. W. thought that the fighting happened almost every day. The arguments were loud and sometimes the police would come. The arguments occurred at all different times of the day and night. During one of the arguments, As. W. was sitting on a couch that Robert had purchased and was watching television when Christine grabbed a knife, stabbed it into the couch, and ripped a hole in it, not knowing that As. W. was sitting there. As. W. fell to the ground and was scared. Robert told Christine that she had almost killed their baby. After that, As. W. went to her room. Christine came to As. W.'s room to console her and told As. W. that she was sorry, that it was going to be all right, and that Robert was going to be out of there soon. As. W. was worried every day when she came home from school that Christine and Robert would be fighting.

¶ 49    As. W. stated further that Robert also hit her. One time, As. W. and her brother were arguing and As. W. ran away from Robert because he was going to hit her. Robert grabbed As. W.'s shirt and ripped it. Christine hit Robert in the head with a little check board, and Christine and Robert started fighting. Although Christine told As. W. that she would keep her safe, Christine was not always able to do so because she was at work and Robert would give As. W. bad "whoopins." Sometimes when Christine was there, Robert would just push Christine out of the way and would give As. W. a "whoopin." Christine did not come between As. W. and Robert when As. W was going to get a "whoopin" because if she did, Robert would hurt Christine.

¶ 50    In March 2013, at the conclusion of the adjudicatory hearing, the trial court took the matter under advisement for a brief period. The following day, the trial court issued its ruling. The trial court found that the State had proven by a preponderance of the evidence that L.G., E.J., As. W., and An. W. were neglected minors and that L.G. was an abused minor. In making her ruling, the trial judge noted that there was "corroboration all over the place" with respect to the allegations of abuse and neglect and that she found that the minors' recantations in this case were not believable and were unpersuasive. The trial judge noted further that there was a history of manipulation and conditioning that had occurred over a number of years with the children being promised money and other benefits and then those promises being broken. The trial judge commented that her statement in that regard also applied to Christine. The written adjudication order provided that the minors were neglected by way of an injurious environment because Robert had sexually abused L.G., D.J., and Ar.

W., because Christine knew about the abuse and did not believe it, and because there was ongoing domestic violence in the home. The written order also provided that L.G. was an abused minor because she was sexually molested by Robert.

¶ 51    A dispositional hearing was held in June 2013. In preparation for the hearing, a dispositional hearing report was prepared and filed by the caseworker. The report was admitted into evidence on motion of the State and was, for the most part, the only evidence presented at the hearing. At the time of the report, L.G. was still living at the treatment center, E.J. was in a traditional DCFS foster home, and As. W. and An. W. were in a traditional foster home. The caseworker noted in her report, among other things, that: (1) Christine had been actively involved with DCFS since the start of this case; (2) an integrated assessment was completed in January 2012 and the services recommended for Christine were that she complete a domestic violence assessment and individual psychotherapy; (3) additional services that were added later for Christine were that she complete a psychological assessment and participate in parenting coaching services; (4) Christine had sought out and had completed parenting classes on her own; (5) Christine had started individual therapy for the third time after having failed to complete the therapy the first two times; (6) Christine declined to enroll in domestic violence counseling, stating that she had not been abused, but did enroll in and successfully complete a domestic violence support group; (7) Christine's psychological assessment had been delayed because the psychologist had not received the necessary paperwork; (8) Christine had been consistent in her visitation with her two younger biological children, As. W. and An. W., and there had been a noticeable positive improvement in her parenting style; (9) although a diligent search had been made, the caseworker was still unable to locate Lakeesha; (10) the services recommended for Robert were that he obtain a sexual offender management board (SOMB) assessment and that he complete parenting classes; (11) Robert initially did not want to be involved in services and had told the caseworker, prior to adjudication, that his attorney had advised him not to participate in services; (12) Robert more recently had gotten involved with services and had completed parenting classes; (13) Robert's SOMB assessment had been delayed because of a change in the approved providers and because the coordinator of the program wanted a psychological assessment first; (14) Robert's psychological assessment had also been delayed because the reviewer had not received the necessary paperwork; (15) Robert had been attending visitation with E.J. but his visitation with As. W. and An. W. had been suspended since December 2012 because Robert's behavior during visitation was inappropriate; and (16) visitation between Robert and L.G. continued to be suspended for therapeutic reasons on the recommendation of L.G.'s sexuality therapist. The caseworker recommended in her report that DCFS receive custody and guardianship of the children, that the children remain in their current placements, and that Robert and Christine be admonished to continue to cooperate with DCFS.

¶ 52    At the conclusion of the hearing, the trial court made L.G., E.J., As. W., and An. W. wards of the court, named DCFS as the guardian of the children, and found that Christine, Robert, and Lakeesha were dispositionally unfit. In so doing, the trial court noted that although Christine and Robert had both engaged in certain aspects of their service plans, they had not yet completed the required services and that there still remained safety concerns over placing the children with Christine or Robert. Christine and Robert filed separate appeals to challenge the trial court's ruling.

¶ 53                                    ANALYSIS

¶ 54        On appeal, Christine and Robert both argue that the trial court erred in determining that the children were neglected and/or abused. Christine asserts that the three underlying factual findings upon which the trial court's neglect determination was based–that Robert had sexually abused Ar. W., D.J., and L.G.; that Christine knew about the allegations of sexual abuse but did not believe the children; and that there was ongoing domestic violence in the home–were all against the manifest weight of the evidence. Robert, on the other hand, only challenges the underlying factual finding that he had sexually abused Ar. W., D.J., and L.G. Robert concedes that the evidence was sufficient to establish that there was ongoing domestic violence in the home. The State argues that the trial's court's determination of abuse and/or neglect in this case was proper and should be affirmed.

¶ 55        On appeal in a juvenile proceeding, a reviewing court will not reverse a trial court's determination of abuse or neglect unless it is against the manifest weight of the evidence. *In re A.P.*, 2012 IL 113875, ¶ 17; *In re A.W.*, 231 Ill. 2d 92, 102 (2008); *In re J.C.*, 396 Ill. App. 3d 1050, 1056 (2009). A finding is against the manifest weight of the evidence only if it is clearly apparent from the record that the trial court should have reached the opposite conclusion. *In re A.W.*, 231 Ill. 2d at 102. Under the manifest weight standard, deference is given to the trial court as finder of fact because the trial court is in the best position to observe the conduct and demeanor of the parties and the witnesses and has a degree of familiarity with the evidence that a reviewing court cannot possibly obtain. *Id*. When the manifest weight standard applies, the reviewing court will not substitute its judgment for that of the trial court on such matters as witness credibility, the weight to be given evidence, and the inferences to be drawn from the evidence, even if the reviewing court would have reached a different conclusion if it had been the trier of fact. *Id*.; *In re Lakita B.*, 297 Ill. App. 3d 985, 994 (1998) (in a child custody case, wide discretion is placed in the trial court to an even greater degree than in an ordinary appeal because of the delicacy and difficulty involved).

¶ 56        A wardship proceeding constitutes a significant intrusion into the sanctity of the family and should not be undertaken lightly. *In re A.P.*, 2012 IL 113875, ¶ 18. The primary consideration in such a proceeding is the best interests of the minor involved, and the focus is on whether that particular minor is neglected, not on whether the minor's parents are neglectful. *Id*. ¶¶ 18-20. At the trial level, the burden is on the State to prove the allegations of neglect by a preponderance of the evidence. *Id*. ¶ 17. If the State fails in that burden, the neglect petition must be dismissed. *Id*.

¶ 57        There is no fixed meaning for the term "neglect" but it has been generally defined as the failure to exercise the level of care that is required under the circumstances, and it encompasses both the willful and the unintentional disregard of parental duty. *Id*. ¶ 22. Pursuant to the Juvenile Court Act of 1987 (Act), neglect may be found where a minor's environment is injurious to his or her welfare. 705 ILCS 405/2-3(1)(b) (West 2010). In general, the term "injurious environment" has been defined as the breach of a parent's duty to ensure a safe and nurturing shelter for his or her children. *In re A.P.*, 2012 IL 113875, ¶ 22. Like the term "neglect," however, the term "injurious environment" does not have a fixed meaning and must be determined from the unique facts of each particular case. See *id*.

¶ 58      "Under the anticipatory neglect theory, the State seeks to protect not only children who are the direct victims of neglect or abuse, but also those who have a probability to be subject to neglect or abuse because they reside, or in the future may reside, with an individual who has been found to have neglected or abused another child." *In re Arthur H.*, 212 Ill. 2d 441, 468 (2004). Evidence of abuse or neglect of one minor is admissible on the issue of the abuse or neglect of any other minor for whom the parent is responsible. 705 ILCS 405/2-18(3) (West 2010). Such evidence, however, does not constitute conclusive proof of neglect of the minor in question. *In re Arthur H.*, 212 Ill. 2d at 468. Rather, in determining whether a particular minor is neglected, a trial court should consider not only the circumstances surrounding the prior neglect of that minor's sibling or siblings but also the care and condition of the minor in question. *Id.* When faced with evidence of prior neglect by a parent or parents, a trial court need not wait to take action until after each particular minor suffers an injury. *Id.* at 477.

¶ 59      In support of their attack on the trial court's underlying finding of sexual abuse in the present case, Christine and Robert assert that the finding was against the manifest weight of the evidence because the children recanted their allegations in their sworn testimony before the trial court and because there was insufficient corroboration to support a finding of neglect or abuse based solely upon the children's previous out-of-court statements (the outcry statements) that the sexual abuse occurred. In making that assertion, Christine and Robert note that there was no physical evidence of sexual abuse, no medical evidence of sexual abuse, no sworn testimony of an eyewitness that the abuse occurred, and no admission by Christine or Robert that the children had been sexually abused. Christine and Robert note further that there were major inconsistencies in the children's outcry statements as to such matters as when the abuse started and stopped, how many times the abuse occurred, where the abuse occurred, and as to the specific acts of abuse that were committed. Those inconsistencies, according to Christine and Robert, are present within the multiple statements of each child individually (the statement that each child made to Kitakis and the statement that each child made to the interviewer that conducted the VSI) and when the statements of each child are compared to the statements of the other children. In addition, Christine and Robert assert that the State did not present any credible evidence to corroborate its claim that the children had been bribed by Robert to recant their allegations–no phone records were presented to show that Robert had been contacting the children, no financial documents were presented to show that Robert had the financial means to bribe the children, and no photographs were presented to show that Robert had, in fact, been recently buying things for the children to persuade them to recant. Christine and Robert also point out that the State did not call the children's adult sibling, C.J., to testify under oath as to the acts of sexual abuse that she allegedly witnessed. Christine and Robert claim, therefore, that there was no way for the trial court to determine whether the statements attributed to C.J. in the indicated reports were credible. For all of the reasons stated, Christine and Robert contend that the trial court's finding of sexual abuse should be reversed.

¶ 60      The State and the GAL argue that the trial court's finding of sexual abuse was not against the manifest weight of the evidence. Initially, the GAL points out that corroboration of the outcry statements was not required in this case because all three of the children involved testified at the adjudicatory hearing about their prior statements and were subject to cross-examination. Next, the State and the GAL assert that if corroboration was required, the

children's outcry statements were sufficiently corroborated by: (1) the trial court's conclusion that the children's current recantations were not believable; (2) the level of detail in the outcry statements, which was inconsistent with a fabrication; (3) the stipulated testimony of Kitakis (the stipulated testimony) that she overheard the children agree to lie in court; (4) the consistency of the statements between the VSIs, the indicated reports, and the stipulated testimony (that the indicated reports and the stipulation corroborated the VSIs); and (5) the evidence that Robert had bribed the children both currently and in the past to either not report the allegations of sexual abuse or to recant them. Based upon that corroboration, the State and the GAL contend that the trial court's finding of sexual abuse should be upheld.

¶ 61    Section 2-18(4)(c) of the Act creates an exception to the general rule against hearsay and allows a minor's out-of-court statements relating to allegations of abuse or neglect to be admitted into evidence at a civil adjudicatory hearing to determine whether the minor is abused or neglected. *In re A.P.*, 179 Ill. 2d 184, 195-96 (1997). "The underlying purpose of section 2-18(4)(c) is to provide a means of proving abuse or neglect in cases where a minor is reluctant or unable to testify." *Id*. at 196. In enacting section 2-18(4)(c), the legislature sought to balance the welfare interests of minors and the rights of those accused of abuse or neglect. *Id*. at 197.

¶ 62    Section 2-18(4)(c) of the Act provides:

> "Previous statements made by the minor relating to any allegations of abuse or neglect shall be admissible in evidence. However, no such statement, if uncorroborated and not subject to cross-examination, shall be sufficient in itself to support a finding of abuse or neglect." 705 ILCS 405/2-18(4)(c) (West 2010).

Our supreme court has interpreted section 2-18(4)(c) to require either cross-examination or corroboration, but not both. See *In re A.P.*, 179 Ill. 2d at 196. Thus, under section 2-18(4)(c), a minor's hearsay statement is sufficient in itself to support a finding of abuse or neglect if either: (1) the minor is subject to cross-examination about the statement, or (2) the occurrence of the abuse or neglect is corroborated by other evidence. *Id*.

¶ 63    In situations where the minor will not be subject to cross-examination about the statement, corroboration of the occurrence of the abuse or neglect becomes very important. See *id*. at 197. "In essence, corroborating evidence is evidence that makes it more probable that a minor was abused or neglected." *Id*. at 199. The form of the corroborating evidence will vary depending upon the unique facts of each case. *Id*. The corroboration need only be of the occurrence itself and not of the identity of the abuser. *Id*. at 198. Corroboration of the occurrence of the abuse or neglect can be provided through circumstantial evidence, such as a medical report or examination indicating signs of sexual abuse, other physical evidence, eyewitness testimony, or an admission by the accused. *Id*. at 199; *In re Custody of Brunken*, 139 Ill. App. 3d 232, 239 (1985); *People v. Embry*, 249 Ill. App. 3d 750, 761-62 (1993) (discussing a similar corroboration requirement under section 115-10 of the Code of Criminal Procedure of 1963); *People v. Ward*, 207 Ill. App. 3d 365, 369-70 (1991) (same). Whether there is sufficient corroboration under section 2-18(4)(c) is a determination that must be made by the trial court on a case-by-case basis. *In re A.P.*, 179 Ill. 2d at 199. "However, in all cases, sufficient corroboration of the abuse or neglect requires more than just witnesses testifying that a minor related claims of abuse or neglect to them." *Id*. at 198. Rather, to satisfy the corroboration requirement of section 2-18(4)(c), there must be independent

evidence that would support a logical and reasonable inference that the act of abuse or neglect described in the hearsay statement occurred. *Id.* at 199.

¶ 64      In the present case, as the GAL points out, corroboration was not required because all three of the victims of the alleged sexual abuse, Ar. W., D.J., and L.G., testified at the adjudicatory hearing, even though they were not called as witnesses by the State. See 705 ILCS 405/2-18(4)(c) (West 2010); *In re A.P.*, 179 Ill. 2d at 196. All three of the children were cross-examined about the previous statements they had made, both to Kitakis and to the interviewer who conducted the VSIs. The three children testified that they either did not make the statements in question or that they lied when they made those statements. The three children were questioned further about why they had allegedly lied, both as to the current allegations and as to the past allegations. It was for the trial court as trier of fact to determine whether the recantations of Ar. W., D.J., and L.G. were believable. See *People v. Brooks*, 187 Ill. 2d 91, 132 (1999). The trial court's determination in that regard, which was made after the trial court had personally viewed the live testimony of Ar. W., D.J., and L.G., was not against the manifest weight of the evidence. See *In re A.P.*, 2012 IL 113875, ¶ 17; *In re A.W.*, 231 Ill. 2d at 102; *In re J.C.*, 396 Ill. App. 3d at 1056.

¶ 65      Even if we were to conclude that corroboration was required in the instant case, we would still rule in favor of the State and the GAL on this point because we believe sufficient corroboration of the occurrence of the sexual abuse was presented to support a finding of abuse or neglect. First and foremost, although the inconsistencies that Christine and Robert point out in the children's outcry statements are indeed present, they are, overall, relatively minor. All three children consistently stated that Robert had sexually abused them for several years, that the sexual abuse involved Robert touching the vaginas of Ar. W. and L.G. and making D.J. engage in sexual acts with the two girls, and that Robert subsequently bribed the children to keep quiet about the abuse or to recant the allegations they had made. Thus, each of the children's statements served as independent evidence that corroborated the statements of the other two children. See *In re A.P.*, 179 Ill. 2d at 199; *In re Alexis H.*, 401 Ill. App. 3d 543, 554 (2010) (the minor victim's outcry statements were sufficiently corroborated by statements of siblings and other evidence); *In re K.O.*, 336 Ill. App. 3d 98, 108-09 (2002) (same); *cf. In re Custody of Brunken*, 139 Ill. App. 3d at 239 (statements by a single minor victim to four separate adults that she had been sexually molested by her father did not serve to corroborate one another and did not satisfy the corroboration requirement under a prior version of the statute). Any inconsistencies in those statements were for the trial court to resolve as trier of fact. See *In re A.W.*, 231 Ill. 2d at 102; *In re A.P.*, 179 Ill. 2d at 201-02 (discussing inconsistencies in the minor victim's statements under a separate consideration, reliability, in the context of whether the statements were sufficiently reliable from a due process standpoint to support a finding of abuse). The occurrence was also corroborated by the out-of-court statements of C.J., that she had witnessed the sexual abuse, and As. W., that she had seen Robert offer L.G. $100 after Robert had touched L.G.'s butt. Those statements were properly before the trial court in the stipulated testimony of Kitakis and in the indicated reports, and it was for the trial court to determine how much weight to give to those statements. See *In re A.W.*, 231 Ill. 2d at 102; *In re R.M.*, 307 Ill. App. 3d 541, 551 (1999) (in determining whether minor children had been physically abused, the trial court was not required to give more weight to witnesses that actually testified before the court). Based upon the evidence presented, we reject the claim of Christine and Robert that there was insufficient

corroboration to support a finding of abuse or neglect. Having reached that conclusion, we will now address the remaining assertions made by Christine in support of her argument on this issue.[4]

¶ 66　　The next underlying factual finding of the trial court that Christine attacks is the trial court's determination that Christine knew about the allegations of sexual abuse but did not believe the children. Christine asserts that the trial court's finding in that regard was against the manifest weight of the evidence because: (1) there is no evidence that Christine ever saw Robert sexually abuse anyone or that Robert ever told Christine that he was doing so; (2) L.G. testified in court that the statements about Christine in that regard were untrue and that Christine was the first person to call the police when the allegations of sexual abuse arose; (3) D.J. stated in his VSI that the children told Christine about the sexual abuse and that Christine reported the allegation; and (4) Christine told DCFS that when the allegations of sexual abuse had been made against Robert in 2006, she reported the allegation to the police, removed the children from the home, had the children stay at a friend's house, and that she only allowed the children to return after they had recanted the allegation and told Christine that they had lied. As part of her assertion, Christine contends that the trial court implicitly found that her failure to believe the children was unreasonable and that it contributed to the children's abuse. Christine claims in that regard that her view as to the truth of the children's allegations was no different than that of DCFS–which had determined six times in the past that the children's allegations of sexual abuse against Robert were unfounded–or that of the two courts that had previously considered the matter–both of which returned the children to Robert after the court proceedings had concluded.

¶ 67　　The State and the GAL assert that the trial court's underlying finding–that Christine knew about the allegations of sexual abuse but did not believe the children–was not against the manifest weight of the evidence, even if it is assumed that the trial court made the implicit finding that Christine suggests. In support of that assertion, the State and the GAL point to the following facts: (1) all three of the children subjected to the sexual abuse, Ar. W., D.J., and L.G., made statements at various times that Christine knew of the abuse; (2) C.J. stated that Christine knew about the abuse and that she was trying to persuade the children to recant, as part of a continuing cycle; and (3) Christine chose not to get an order of protection against Robert for the children, so C.J. got one instead.

¶ 68　　After having reviewed the record in the instant case, we agree with the State and the GAL and conclude that the trial court properly found that Christine knew about the allegations of sexual abuse and did not believe the children. Contrary to Christine's assertion on appeal, we do not assume that the trial court implicitly found that Christine's conduct was unreasonable, and we see no reason at the adjudicatory stage of the proceedings to make such an assumption. Rather, we need only evaluate the specific finding that the trial court made. At the adjudicatory hearing, the trial court had before it the prior statements of Ar. W., D.J., and L.G., all of whom stated that Christine knew about the ongoing sexual abuse of the children. The trial court also had before it the statement of C.J. that Christine had not supported the children when they had made the allegations in the past and was trying to persuade the children to recant the current allegations against Robert so that Robert would get them an apartment and would buy them things. It was the trial court's role as trier of fact to consider

[4]Robert has made no additional assertions or arguments in this appeal.

and weigh that evidence, along with the conflicting evidence that was also present, as Christine pointed out here, and the recantations of the children's prior statements. See *In re A.W.*, 231 Ill. 2d at 102. In addition to the findings in the written adjudication order, the trial court stated when it announced its ruling that there had been a cycle of conditioning and manipulation of the children that had been going on for several years and that Christine was a part of that cycle. Based upon the evidence presented at the adjudicatory hearing and the trial court's specific finding, we conclude that this aspect of the trial court's determination was not against the manifest weight of the evidence. See *In re A.P.*, 2012 IL 113875, ¶ 17; *In re A.W.*, 231 Ill. 2d at 102; *In re J.C.*, 396 Ill. App. 3d at 1056.

¶ 69 The third underlying factual finding that Christine attacks is the trial court's finding that there was domestic violence in the home. Christine asserts that the finding was against the manifest weight of the evidence because: (1) Ar. W., D.J., and L.G. had recanted all of their allegations, including those relating to domestic violence; (2) there was no medical evidence in the record to support the allegation that the minors had been beaten; (3) there was no independent testimony, such as from a teacher or school official, to suggest the minors had been beaten; (4) there was no physical evidence to support a finding of domestic violence; and (5) the lack of any physical evidence with so many beatings allegedly involved was highly unlikely and cast doubt on the truth of the allegations. In making that assertion, Christine acknowledges that As. W. did testify in court as to domestic violence in the home. Christine notes, however, that As. W.'s testimony in that regard was contradicted by the recantations of her siblings and by the lack of any physical evidence. Christine notes further that it would be highly unlikely that domestic violence was occurring in the home on a daily basis, as As. W. stated, but that As. W. was the only person who saw it occur.

¶ 70 The State and the GAL assert that the trial court's underlying factual finding of domestic violence was not against the manifest weight of the evidence. In support of that assertion, the State and the GAL point out that statements confirming the domestic violence in the home were made by all of the children and by Christine herself and were before the trial court as evidence at the adjudicatory hearing. The State notes that the presentation of medical or physical evidence was not required for it to meet its burden under the law. The State points out further that the trial court found that the recantation of the children's prior statements of domestic violence was not believable and that Christine herself stipulated at two prior shelter care hearings that domestic violence had occurred in the home. The State and the GAL ask, therefore, that we uphold the trial court's finding of domestic violence in the home.

¶ 71 Christine responds that any stipulation that she made for the purpose of a prior shelter-care hearing did not constitute an admission or a stipulation for the purpose of the adjudicatory hearing and that we should reject the State's assertion in that regard.

¶ 72 Having considered the arguments of the parties on this point, we conclude that the trial court's underlying factual finding of domestic violence in the home was not against the manifest weight of the evidence. All of the children involved, Ar. W., D.J., L.G., E.J., As. W., and An. W., told Kitakis that Robert would beat them or their siblings and described those beatings to Kitakis in detail.[5] Those statements were again made by Ar. W., D.J., and L.G. in their VSIs, and it was for the trial court to determine whether the recantations of

---

[5]As noted above, E.J.'s testimony and statement at times were that Robert did not beat him but did beat his siblings.

those statements were believable. See *Brooks*, 187 Ill. 2d at 132. In addition, As. W. testified under oath and *in camera* at the adjudicatory hearing that Robert grabbed her and tore her shirt, that Robert would beat Christine, and that during one particular incident, Christine stabbed a knife into a couch that As. W. was sitting on and nearly struck As. W. with the knife. Furthermore, several of the children told Kitakis that Robert had beaten, struck, or choked Christine, a fact that Christine herself acknowledged when she initially spoke to Kitakis. Under the facts of the present case, the trial court properly found that there was ongoing domestic violence in the home. Having reaching that conclusion, we need not determine what weight, if any, should be given to Christine's stipulations at the two prior shelter care hearings that there was ongoing domestic violence in the home.

¶ 73 As her final contention on appeal, Christine argues that the trial court erred in finding after the dispositional hearing that she was an unfit parent. Christine asserts that the trial court's finding in that regard was against the manifest weight of the evidence because the evidence showed that: (1) Christine had never abused anyone; (2) Christine would step in and would try to stop or keep Robert from beating As. W.; (3) Christine had been actively involved with DCFS since the opening of the case; (4) Christine completed parenting classes on her own; (5) although Christine did not believe that she was a victim of domestic violence or that she needed domestic violence counseling, she had attended and successfully completed a domestic violence support group; (6) Christine participated in obtaining a psychological evaluation as she was directed to do; (7) Christine was consistent with her visitation with As. W. and An. W.; and (8) there had been a positive improvement in Christine's parenting style. Christine asserts further that the children have been out of her physical custody for more than two years and that even though Robert's actions were entirely to blame for the removal of the children, she has substantially complied with all of DCFS's requirements. Christine asks therefore that we reverse the trial court's finding of unfitness as to her and that we remand this case with specific directions to the trial court to return the physical custody of As. W. and An. W. to Christine and to implement any protection orders that the trial court determines are necessary to protect the children from Robert. As noted previously, Robert does not challenge the trial court's finding of parental unfitness as to him and has not raised this issue in his appeal.

¶ 74 The State and the GAL argue that the trial court's finding of parental unfitness was proper and should be affirmed. The State asserts that the evidence presented at the dispositional hearing (the dispositional hearing report) showed that although Christine had made some progress in completing the services offered to her by DCFS, she had not yet reached the point of being fit to have the children returned to her. Most notably, Christine had recanted her statement about Robert physically abusing her and was continually in denial that she and her children had been victims of domestic abuse. Because of that denial, Christine had not completed the domestic violence counseling that had been recommended for her and instead had only completed a domestic violence support group. The GAL, on the other hand, points out that the evidence had previously shown that Robert was sexually molesting the children and that there was ongoing domestic violence in the home. The State and the GAL assert further that Christine's conduct did, in fact, contribute to the finding of abuse and/or neglect because Christine failed to keep the children safe from Robert. Therefore, the State and the GAL ask that we reject Christine's argument on this issue and that we uphold the ruling of the trial court.

¶ 75    A trial court's finding of parental unfitness made pursuant to section 2-27 of the Act (705 ILCS 405/2-27 (West 2010)) will not be reversed on appeal unless it is against the manifest weight of the evidence. *In re A.W.*, 231 Ill. 2d at 104. A trial court's finding is against the manifest weight of the evidence only if it is clearly apparent from the record that the trial court should have reached the opposite conclusion. *Id.* at 102, 104. As noted above, because of the trial court's position as trier of fact, deference is given to the trial court's findings of fact in a juvenile-neglect proceeding. *Id.*; *In re Lakita B.*, 297 Ill. App. 3d at 994.

¶ 76    Section 2-27 of the Act provides that a minor who has been adjudged a ward of the court may be placed with someone other than his or her parents if the trial court determines that the parents are either "unfit or are unable, for some reason other than financial circumstances alone, to care for, protect, train or discipline the minor or are unwilling to do so, and that the health, safety, and best interest of the minor will be jeopardized if the minor remains in the custody of his or her parents." 705 ILCS 405/2-27(1) (West 2010). The standard of proof for a trial court's section 2-27 finding of parental unfitness that does not result in a complete termination of all parental rights is by a preponderance of the evidence. *In re April C.*, 326 Ill. App. 3d 245, 257 (2001). In making that determination, all relevant and helpful evidence may be considered. 705 ILCS 405/2-22(1) (West 2010); *In re April C.*, 326 Ill. App. 3d at 261.

¶ 77    In the instant case, after reviewing the record thoroughly, we conclude that the trial court did not err in finding that Christine was dispositionally unfit. In reaching that conclusion, the trial court noted the progress that Christine had made and commended her for it. The trial court ultimately determined, however, that enough progress had not been made by Christine that would allow the trial court to find that Christine was dispositionally fit. More specifically, the trial court noted that it still had safety concerns over placing the children with Christine or Robert. Based upon the record before us in this case and the trial court's specific finding, we conclude that the trial court's determination of parental unfitness was not against the manifest weight of the evidence as to Christine. See *In re A.W.*, 231 Ill. 2d at 102-04.

¶ 78                                    CONCLUSION

¶ 79    For the foregoing reasons, we affirm the judgment of the circuit court of Will County.

¶ 80    Affirmed.

¶ 81    JUSTICE McDADE, specially concurring.

¶ 82    The majority holds that the decision of the circuit court of Will County finding respondents, Christine W. and Robert G., dispositionally unfit and certain of their children neglected and/or abused, was not against the manifest weight of the evidence and should properly be affirmed. Because it is not clearly apparent from the record that the trial court should have reached the opposite conclusion, our standard of review requires that we affirm. I, therefore, concur in our decision.

¶ 83    I write separately to express my belief that, on these facts and under this standard, if the trial court had reached the opposite conclusion, we would still be required to affirm.

¶ 84      This conclusion makes this case extremely troubling. The children whom the State seeks to protect seemingly have no respect for truth–a circumstance which significantly complicates the truth-seeking process and undermines my own comfort with and confidence in the factual findings reached by the trial court and affirmed by us.

¶ 85      Whatever else the evidence shows, it is abundantly clear that the children have persistently determined what they want to have happen and have lied without any compunction in order to achieve that end. They "outcry," then take it back. Within this scenario, DCFS has investigated claims by the children against Robert G. on six occasions and has found them to be unfounded. The trial court has twice previously found Robert G. fit following at least one such investigation and had returned the children to his custody. If the trial court is correct, as we find it is, the children not only expressed an *intent* to lie at the hearing, they actually did lie under oath.

¶ 86      Under these circumstances, while one can feel confident that our decision is legally correct given our standard of review, I am not completely comfortable that our affirmance of the trial court's determination that the parents are dispositionally unfit–on the bases alleged by the State–is actually correct.