No. 3–08–0934

Filed December 29, 2009

IN THE APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

A.D., 2009

| | | |
|---|---|---|
| In re J.C., Jr., | ) | Appeal from the Circuit Court |
| | ) | for the 10th Judicial Circuit, |
| a Minor, | ) | Peoria County, Illinois |
| | ) | |
| (The People of the State of Illinois, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | No. 08–JA–195 |
| | ) | |
| v. | ) | |
| | ) | |
| T.C., | ) | Honorable |
| | ) | Kim L. Kelley, |
| Respondent-Appellant.) | ) | Judge, Presiding. |

JUSTICE CARTER delivered the opinion of the court:

The respondent, T.C., is the biological mother of the minor J.C. She appeals from the trial court's dispositional order under the Juvenile Court Act (the Act) and challenges the decisions of the trial court that J.C. was neglected and that T.C. was unfit. 705 ILCS 405/1–1 et seq. (West 2008). After a review of the parties' arguments and the record, we affirm.

FACTS

The minor, J.C., was born on August 8, 2008. A petition alleging that J.C. was neglected was filed on September 3, 2008. The petition alleged that J.C. was neglected due to an injurious environment in that: (1) his mother, respondent T.C., was previously found unfit in Peoria County case numbers 97–JA–101, 00–JA–293, and 06–JA–163 with no subsequent finding of fitness; (2)

the respondent had not completed services that would result in the return home of the minor's siblings in those cases; (3) the minor's father was involved in case number 06–JA–163, had been found fit, but court would not return minor home until further order; (4) the father resided with the respondent and would not move; and (5) the father had a criminal history including drug offenses and theft dating back to 1996. The minor's father is not a party to this appeal. Following a shelter care hearing, J.C. was placed in the temporary custody of the Department of Children and Family Services (DCFS) and placed with a relative foster parent. On September 16, 2008, the respondent filed her answer to the neglect petition and stipulated to the first, third, fourth and fifth allegation but denied that she had failed to complete services that would result in the return home of her other children.

An adjudicatory hearing was held on October 28, 2008. The only factual issue in dispute was whether the respondent had completed services required in the previous juvenile neglect cases that would result in the return home of those children. The respondent testified that in the previous juvenile cases she had been ordered to complete a psychological examination and undergo counseling and that she had completed the examination and had been in counseling for two years. She also testified that she had completed a domestic violence class and was visiting her children. She had not tested positive for illegal drugs in the year prior to the hearing. The respondent testified that there were three ongoing services required at the time of the hearing– drug testing, counseling, and visits with minors K.C. and J.C.– and that she was participating in those services.

The State submitted numerous exhibits as a factual basis in support of the remaining allegations of the neglect petition, to which the respondent had stipulated, consisting of the

2

respondent's counseling records, a psychological evaluation, and numerous documents from case numbers 97–JA–101, 00–JA–293, and 06–JA–163. The respondent underwent a psychological evaluation by Dr. Jane Velez on January 11, 2007. The respondent's full scale intelligence quotient was 69, which the report states on different pages falls within the borderline and intellectually deficient ranges of cognitive functioning. All of the subtest scores fall in the intellectually deficient, borderline, or low average range. Dr. Velez also reported that the respondent's adaptive behavior score falls within the borderline range and indicated the respondent required infrequent or no assistance for independent living. Dr. Velez stated that the respondent's "main difficulties appear to be that she is a rather distant and asocial individual with impaired cognitive ability."

The report also indicates that the respondent has a history of being involved in abusive relationships. The respondent told Dr. Velez that she had used cannabis in the past but had not used any drugs in over three years and did not plan on doing so in the future. Dr. Velez concluded, "D.C.F.S. and the Court should be cautious in returning [the respondent's] child to her care *** due to [her] lengthy history with D.C.F.S. and seriousness of these concerns."

Court records from the previous neglect cases concerning the respondent and her other children indicate that the respondent was initially found unfit in case number 97–JA–101. In that case, a juvenile petition was filed in June 1997 alleging that minor Z.P. was neglected because Z.P. was brought to the hospital in the following condition: "extremely filthy and unkempt with a urine soaked diaper, pneumonia and a temperature, eczema to the head and face, diaper rash, [and] impetigo." Z.P. was born premature on December 4, 1996 and on June 19, 1997 remained below the fifth percentile in weight and length for her age. Z.P. also had a medical condition that

3

required use of a nebulizer and pharmacy records indicated that Z.P.'s last prescription for the nebulizer medicine had not been filled. Finally, the petition alleged that the respondent had stated prior to Z.P.'s birth that she did not want Z.P. and would starve her to death. On September 2, 1997, the court found the petition had been proven and that Z.P. was neglected. On June 17, 1999, the respondent's parental rights to Z.P. were terminated, following the respondent's surrender of such rights.

A.P. was born on December 5, 1997. A juvenile petition regarding A.P. was filed on January 14, 1998, alleging A.P. was neglected due to an injurious environment in part because (1) Z.P. had been removed from the respondent's care and the respondent had not made sufficient progress to have her returned, and (2) A.P.'s weight had dropped to 4 lbs. 2 oz. due to improper feeding by the respondent. The respondent admitted the allegations and A.P. was found to be neglected. The respondent was found unfit on April 14, 1998, and her parental rights were ultimately terminated for failure to make reasonable efforts and progress toward the return of A.P.

W.P. was born on August 3, 1999. A petition alleging W.P. to be neglected was filed on August 6, 1999. That petition alleged neglect due to an injurious environment because the respondent had been previously found unfit on April 14, 1998, and there had been no subsequent finding of fitness. W.P. was adjudicated to be neglected, and the respondent was found unfit on May 22, 2000. The respondent's parental rights to W.P. were terminated on November 13, 2000, after she was found in default.

In case number 00–JA–293, T.P. was born on December 2, 2000, and a petition alleging that T.P. was neglected was filed on December 7, 2000. That petition alleged that T.P. was neglected due to an injurious environment in that the respondent had been previously found unfit,

4

and there was no subsequent finding of fitness. The respondent was found unfit as to T.P. on May 7, 2001. The respondent subsequently surrendered her parental rights to T.P., and her parental rights were terminated on August 25, 2004.

B.P. was born on January 22, 2002, and a petition alleging neglect of B.P. was filed on January 28, 2002. That petition alleged that B.P. was neglected due to an injurious environment in that the respondent had been previously found unfit, and there was no subsequent finding of fitness. B.P. was found neglected on April 22, 2002, and the respondent was found unfit as to B.P. on August 26, 2002. The respondent's parental rights to B.P. were terminated on December 8, 2004.

Q.P. was born on August 4, 2003, and a neglect petition was filed on August 8, 2003. That petition alleged that Q.P. was neglected due to an injurious environment in that the respondent had been previously found unfit, and there was no subsequent finding of fitness. Q.P. was adjudicated neglected, and the respondent was found unfit as to Q.P. on November 5, 2003. Her parental rights to Q.P. were terminated on July 6, 2005, after she defaulted.

In case number 06–JA–163, K.C. was born on June 30, 2006, and a neglect petition was filed on July 10, 2006. K.C. and J.C. have the same mother and father. The neglect petition alleged that K.C. was neglected because the respondent had been found unfit in previous juvenile cases with no subsequent finding of fitness; the respondent had failed to complete necessary services in prior cases; K.C.'s father had pushed the respondent into a wall; and K.C.'s father had been convicted of driving under the influence of alcohol in 2004. K.C. was found to be neglected on October 17, 2006, and the respondent was found unfit as to K.C. following a dispositional hearing on November 21, 2006. At a permanency review hearing in March 2008, the court found

5

that the respondent had made mixed efforts to achieve the goal of returning K.C. home. After another permanency hearing in July 2008, the respondent was found to remain unfit.

Counseling records from Lutheran Social Services were also presented to the court. These reports indicate that while the respondent's attendance at her counseling sessions was improving, she continued to fail to attend sessions without calling. The records also indicate that the respondent's therapist, Mary Hornsby, had concerns regarding the respondent and the minor's father's ability to parent. On August 29, 2008, Hornsby attended a visit between the respondent, the father and K.C. at the parents' apartment. Hornsby noted that the parents did not appear to be attentive to safety hazards for K.C. such as an open staircase and running with a long, pointed comb. Hornsby also noted that the respondent and the father "continued to give adult meaning to [K.C.'s] actions." At the conclusion of the hearing on the instant neglect petition, the court found that the petition was proven in its entirety by the preponderance of the evidence and, thus, that J.C. was neglected.

On November 4, 2008, the court held a dispositional hearing in the instant case. The respondent submitted proof of her completion of a domestic violence curriculum through her counselor. Jessica Wolfram, the parties' caseworker through Lutheran Social Services, answered questions at the hearing. Wolfram stated that she was not recommending any new services for the respondent at that time, but that she had concerns regarding the respondent's parenting ability. The respondent had completed almost all of her required services, but Wolfram stated that the respondent needed to visit J.C. more often and demonstrate an ability to parent.

Wolfram also submitted a dispositional hearing report, a service plan and an assessment to the court prior to the dispositional hearing, which the court stated it had reviewed. At the time of

6

these reports, the respondent was living with J.C.'s father in an apartment in Peoria, Illinois. Wolfram also reported that the respondent remained in excellent contact with her and has been willing to participate in services. There was no indication that the respondent had used illegal drugs since 2003. The respondent had undergone a psychological evaluation on January 11, 2007, in connection with K.C.'s neglect case, and was participating in counseling. The respondent's initial participation in counseling was sporadic, but had recently become more consistent. The respondent had been twice terminated from domestic violence classes due to her excessive absences, but had completed a domestic violence curriculum through her individual counseling. Wolfram indicated that she believed that the respondent and the minor's father had made progress with their service plan, but she remained concerned about both parents' parenting ability due to their delayed cognitive functioning. Wolfram reported that each parent's psychological evaluation indicated they may require assistance parenting their children from a responsible adult.

The respondent attended her weekly visits with K.C. However, Wolfram reported that the respondent needed intense and constant guidance with parenting during these visits. Wolfram stated that it did not appear that the respondent understood K.C.'s developmental stage. In addition, the respondent appeared to need help with cooking.

At the conclusion of the hearing, the court found that it was in J.C.'s best interest to be made a ward of the court. The court found the respondent to be unfit and unable to care for, protect, train, or discipline J.C. and named DCFS as guardian of J.C. The court indicated that the basis for its decision was the respondent's 2007 psychological evaluation, her participation in services, and her difficulties in caring for a child. Further, the court found the father unfit because

7

of a positive drug test. The court ordered both parents to undergo a new psychological evaluation. The respondent appealed.

## ANALYSIS

### I. Neglect

On appeal, the respondent first maintains that the trial court erred by finding J.C. neglected due to an injurious environment because that finding was against the manifest weight of the evidence. The respondent contends that the previous findings of the respondent's unfitness were irrelevant to the court's determination of neglect in this case because the State failed to prove J.C. was neglected under the theory of anticipatory neglect. The State disagrees, contending that the court properly found that J.C. was neglected due to an injurious environment based upon a theory of anticipatory neglect.

Under section 2–3(1)(b) of the Act, a neglected minor includes "any minor under 18 years of age whose environment is injurious to his or her welfare." 705 ILCS 405/2–3(1)(b) (West 2008). The terms "neglect" and "injurious environment" do not have fixed meanings, but rather the meanings vary with the facts and circumstances of a particular case. In re Arthur H., 212 Ill. 2d 441, 463, 819 N.E.2d 734, 746 (2004). "Thus, cases involving such allegations are sui generis and must be decided on the basis of their individual facts." In re K.L.S-P., 383 Ill. App.3d 287, 292, 891 N.E.2d 946, 950 (2008).

The State bears the burden of proving allegations of neglect by a preponderance of the evidence. K.L.S-P., 383 Ill. App.3d at 291, 891 N.E.2d at 950. We review a trial court's neglect finding to determine whether that finding was against the manifest weight of the evidence. K.L.S-P., 383 Ill. App.3d at 291-92, 891 N.E.2d at 950. A finding is against the manifest weight of the

8

evidence only when the opposite conclusion is clearly evident. K.L.S-P., 383 Ill. App.3d at 292, 891 N.E.2d at 950.

In this case, the respondent contends that the findings in previous cases brought under the Act that she was an unfit parent are irrelevant to the determination of J.C.'s neglect, citing Arthur H., 212 Ill. 2d 441, 819 N.E.2d 734. In Arthur H., the supreme court first held "that the Act instructs the circuit court during the adjudicatory hearing to determine whether the child is neglected, and not whether the parents are neglectful" and that the appellate court's "analysis of the relative blame of each parent for the child's neglect was improper." Arthur H., 212 Ill. 2d at 467, 819 N.E.2d at 749. The court then considered whether the trial court erred by finding the minor neglected and concluded that the trial court's finding that the minor was neglected under the theory of anticipatory neglect was against the manifest weight of the evidence. Arthur H., 212 Ill. 2d at 467-70, 819 N.E.2d at 749-51. Thus, we agree with the respondent's statement that the focus at the adjudicatory stage of proceedings under the Act is whether the minor is neglected. This does not mean however, as the respondent appears to argue, that a prior finding of unfitness is irrelevant to a neglect determination. Just as the facts and circumstances leading to a prior finding of abuse or neglect are relevant to a neglect determination (Arthur H., 212 Ill. 2d at 468, 819 N.E.2d at 749-50), so too are the facts and circumstances leading to a finding of unfitness relevant to a neglect determination (see In re D.F., 201 Ill.2d 476, 500-01, 777 N.E.2d 930, 944 (2002) (concluding "that depending on the type of neglect alleged, evidence of neglect toward one child may be relevant to the question of a parent's fitness with respect to another child")). We caution, however, that just as a prior neglect finding is not evidence of per se neglect of another child (Arthur H., 212 Ill. 2d at 468, 819 N.E.2d at 749), a prior finding of unfitness does not

prove per se neglect (see A.W., 231 Ill. 2d at 105, 896 N.E.2d at 324 (affirming finding of unfitness where respondent had been previously found unfit and failed to produce evidence that he had taken steps to correct the conditions that led to the previous unfitness determination); see also In re D.C., 209 Ill. 2d 287, 299-302, 807 N.E.2d 472, 478-80 (2004) (rejecting State's argument that "unfitness as to one child is unfitness as to all" and holding that when deciding whether a parent is unfit under section 1(D)(m)(iii) of the Adoption Act courts must find "clear and convincing evidence of a lack of reasonable progress during the applicable time period with respect to each child")).

In the instant case, the record contains evidence beyond the recitation of the respondent's status as unfit in prior cases that supports a finding of neglect under the theory of anticipatory neglect. "Under the anticipatory neglect theory, the State seeks to protect not only children who are the direct victims of neglect or abuse, but also those who have a probability to be subject to neglect or abuse because they reside, or in the future may reside, with an individual who has been found to have neglected or abused another child." Arthur H., 212 Ill. 2d at 468, 819 N.E.2d at 749. Proof of neglect of one minor is admissible on the issue of the neglect of any other minor for whom the parent is responsible. 705 ILCS 405/2–18(3) (West 2008). However, the supreme court has emphasized "that the mere admissibility of evidence does not constitute conclusive proof of the neglect of another minor." Arthur H., 212 Ill. 2d at 468, 819 N.E.2d at 750. In other words, "there is no per se rule that the neglect of one child conclusively establishes the neglect of another child in the same household." Arthur H., 212 Ill. 2d at 468, 819 N.E.2d at 749. "Rather, 'such neglect should be measured not only by the circumstances surrounding the sibling, but also by the care and condition of the child in question.' " Arthur H., 212 Ill. 2d at

10

468, 819 N.E.2d at 749-50 quoting In re Edward T., 343 Ill. App. 3d 778, 797, 799 N.E.2d 304 (2003); see also In re Edricka C., 276 Ill. App. 3d 18, 29-31, 657 N.E.2d 78, 85-86 (1995). Nevertheless, the supreme court also recognizes that "when faced with evidence of prior neglect by parents, 'the juvenile court should not be forced to refrain from taking action until each particular child suffers an injury.' " Arthur H., 212 Ill. 2d at 477, 819 N.E.2d at 754-55 quoting In re Brooks, 63 Ill. App. 3d 328, 339, 379 N.E.2d 872 (1978).

Prior to J.C.'s adjudication as a neglected minor in 2008, seven of the respondent's children were found neglected between 1997 and 2006. The respondent's parental rights have been terminated as to six of those children, and case number 06–JA–163, involving K.C., is ongoing. While Z.P. and A.P. were found neglected due to acts by the respondent, each of the respondent's subsequent children– W.P., T.P., B.P. Q.P., K.C. and J.C.– have been removed from her care shortly after his or her birth and all apparently found neglected under the theory of anticipatory neglect. Thus, 11 years have passed between the circumstances of Z.P.'s neglect and the allegations of J.C.'s neglect, and 10 years have passed between the similar circumstances of A.P.'s neglect and the instant allegations. Courts have found a lengthy period of time between allegations of neglect or abuse, without evidence of current conditions of the current child's neglect or abuse, to be insufficient to prove anticipatory neglect. Edricka C., 276 Ill. App 3d at 28-31, 657 N.E.2d at 84-86. Significant to this case however, Z.P. and T.P. were both found neglected as infants due to the respondent's failure to attend to their medical needs and failure to feed them properly. Under the unique facts of this case, the court need not wait for another infant, J.C., to be neglected in the same manner before finding him neglected under the theory of anticipatory neglect.

In addition, the circumstances of the intervening years between the findings of neglect of Z.P. and the instant allegations support a finding of anticipatory neglect of J.C. The respondent's involvement with DCFS has been almost continuous since her first child, Z.P., was approximately six months old. The cases involving the respondent's next five children appear to overlap or be separated by only a few months at most, and each of those cases ended with the termination of the respondent's parental rights. It appears from the record before us that the respondent surrendered her rights to two of those minors, defaulted to two others, and was found unfit after a trial as to the remaining two. Then, approximately one year lapses before K.C. was born and found neglected. J.C. was born approximately two years later, while K.C. remained in foster care. The respondent was found to remain unfit as to K.C. at a permanency review hearing just weeks before J.C.'s birth.

Furthermore, although the evidence showed that at the time of the adjudicatory hearing the respondent had completed domestic violence training and a psychological evaluation, other required services were still ongoing. The respondent's therapist, Mary Hornsby, remained concerned regarding both parent's ability to parent and reported incidents where she observed the parents' apparent lack of understanding of K.C.'s safety and developmental abilities. Likewise, Dr. Velez indicated in the 2007 psychological evaluation, which was conducted as part of K.C.'s ongoing neglect case, that the court should be cautious in returning K.C. to the respondent's care. Thus, we conclude that the trial court's finding that J.C. was neglected was not against the manifest weight of the evidence.

## II. Unfitness

Next, the respondent maintains that the trial court erred by finding her unfit at the

12

conclusion of the dispositional hearing. The State contends that the question of the respondent's fitness is moot in this case because the court also found that she was unable to care for, protect, train or discipline J.C.

At the dispositional stage of proceedings under the Act, the court shall determine whether it is in the best interests of the public and the minor that the minor be made a ward of the court. 705 ILCS 405/2–22(1) (West 2008). If the minor is made a ward of the court, the court shall then determine the proper disposition of the minor. 705 ILCS 405/2–22(1) (West 2008). A minor found to be neglected and made a ward of the court may be (1) continued in the care of his parent, guardian or legal custodian; (2) restored to the custody of his parent, guardian or legal custodian; (3) ordered partially or completely emancipated; or (4) placed in accordance with section 2–27 of the Act. 705 ILCS 405/2–23(1)(a) (West 2008).

> "However, in any case in which a minor is found by the court to be neglected or abused under Section 2-3 of this Act, custody of the minor shall not be restored to any parent, guardian or legal custodian whose acts or omissions or both have been identified, pursuant to subsection (1) of Section 2-21, as forming the basis for the court's finding of abuse or neglect, until such time as a hearing is held on the issue of the best interests of the minor and the fitness of such parent, guardian or legal custodian to care for the minor without endangering the minor's health or safety, and the court enters an order that such parent, guardian or legal custodian is fit to care for the minor." 705 ILCS 405/2-23(1)(a) (West 2008).

If the court determines that a parent, guardian or legal custodian is "unfit or are unable, for some reason other than financial circumstances alone, to care for, protect, train or discipline the minor

13

or are unwilling to do so," and that the best interest of the minor will be jeopardized if the minor remains in the custody of his or her parents, guardian or custodian, the court may, inter alia, commit the minor to DCFS for care and service. 705 ILCS 405/2–27(1) (West 2008). On review, the trial court's dispositional decision will be reversed only if the findings of fact are against the manifest weight of the evidence or the trial court committed an abuse of discretion by selecting an inappropriate disposition. In re Ta.A., 384 Ill. App. 3d 303, 306, 891 N.E.2d 1034, 1037-1038 (2008)

In this case, the trial court found the respondent to be both unfit and unable to care for, protect, train or discipline J.C. In her appellate brief, the respondent does not challenge the court's finding that she is unable to care for, protect, train or discipline J.C. Thus, the respondent has waived a challenge to that finding. Official Reports Advance Sheet No. 15 (July 16, 2008), R. 341((h)(7), eff. July 1, 2008.

As to the trial court's finding that the respondent is unfit, we conclude that the court's finding was not against the manifest weight of the evidence. Although the respondent had completed some of her required services, counseling and visits were still ongoing. Wolfram stated at the dispositional hearing that the respondent needed to visit J.C. more often and demonstrate an ability to parent. Both Wolfram and the respondent's therapist, Hornsby, remained concerned regarding the respondent's ability to parent. Wolfram reported that the respondent needed intense and constant guidance with parenting during the respondent's visits with K.C. It is not clearly evident from this evidence that the respondent was fit to care for, protect, train or discipline J.C. Thus, the trial court did not err by finding the respondent unfit and committing J.C. to DCFS guardianship.

14

CONCLUSION

We conclude that the trial court's findings of neglect and unfitness were not against the manifest weight of the evidence. Accordingly, the judgment of the Peoria County circuit court is affirmed.

Affirmed.

HOLDRIDGE and WRIGHT, J. J. concurring.