NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (4th) 200567-U

NOS. 4-20-0567, 4-20-0568 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 8, 2021
Carla Bender
4th District Appellate
Court, IL

| | |
|---|---|
| *In re* B.S., a Minor <br><br> (The People of the State of Illinois, <br>          Petitioner-Appellee, <br>          v.     (No. 4-20-0567) <br> Christal S., <br>          Respondent-Appellant). <br> _____ <br> *In re* P.S., a Minor <br><br> (The People of the State of Illinois, <br>          Petitioner-Appellee, <br>          v.     (No. 4-20-0568) <br> Christal S., <br>          Respondent-Appellant). | ) Appeal from the <br> ) Circuit Court of <br> ) Macon County <br> ) No. 20JA174 <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) No. 20JA175 <br> ) <br> ) <br> ) <br> ) Honorable <br> ) Thomas E. Little, <br> ) Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Justices Turner and Steigmann concurred in the judgment.

**ORDER**

¶ 1    *Held*:  (1) By finding the minors to be in an environment injurious to their welfare when they were in respondent's custody, the circuit court did not make a finding that was against the manifest weight of the evidence.

(2) The findings of fact that the circuit court made in the dispositional hearing are not against the manifest weight of the evidence.

¶ 2    Respondent, Christal S., has two daughters: B.S., born March 31, 2013, and P.S., born March 27, 2012. After finding those two minors to be neglected and abused, the circuit court of Macon County entered dispositional orders making them wards of the court and awarding

custody and guardianship to the guardianship administrator of the Illinois Department of Children and Family Services (DCFS). Respondent appeals, challenging the findings and disposition as being against the manifest weight of the evidence.

¶ 3        Our standard of review is deferential. It is unclear that, in the adjudicatory hearing, the State failed to prove neglect. It is unclear that the factual findings the court made in the dispositional hearing lacked an evidentiary basis. Therefore, we affirm the judgments in the cases of B.S. and P.S.

¶ 4                                  I. BACKGROUND

¶ 5                        A. The Consolidated Adjudicatory Hearing

¶ 6                          1. *The Testimony of Stephanie Moreau*

¶ 7        Stephanie Moreau was a child protection specialist for DCFS. The assistant state's attorney asked Moreau why B.S. and P.S. had been taken into protective custody. Moreau began to answer:

> "We—the report was that there—
>
>> MS. WACHUKWU [(RESPONDENT'S ATTORNEY)]: Objection.
>>
>> THE COURT: Overruled.
>>
>> MS. WACHUKWU [*sic*]: Not offered for proof [*sic*].
>>
>> THE COURT: Overruled. You may go ahead.
>>
>> THE WITNESS: It was reported that there was—while [B.S.] was in the car that there were shots fired in the vehicle that Mom was driving. A source came forward that was in the car when this occurred and confirmed it, as well as [B.S.] reporting it to another person, the aunt.
>>
>> BY MS. BOLTON [(ASSISTANT STATE'S ATTORNEY)]:

Q. And so that's what triggered the protective custody?

A. Correct.

Q. Okay. Did you have any involvement or interviews with any of the family members after this protective custody had taken place, or had all of your stuff been done ahead of that?

A. I had spoken with most of my contacts with the family, which there was four different contacts with family members, different family members, who all reported."

¶ 8 Before taking the children into protective custody, Moreau sought out respondent to get her side of the story. On July 17, 2020, Moreau went to respondent's home in Forsyth, Illinois. No one came to the door. Moreau, however, was able to reach respondent by telephone. Respondent balked at the idea of meeting in her home. Respondent explained to Moreau that, because the house was empty and because respondent "ha[d] no money for food for her or her children," she was living with her mother.

¶ 9 Evidently, Moreau (for whatever reason) was unconvinced that the Forsyth home was uninhabited, for the assistant state's attorney asked Moreau:

"Q. And [B.S.] was living in this home with no furniture?

A. Correct.

Q. The seven-year-old?

A. Correct."

¶ 10 In lieu of meeting with respondent in the empty house, Moreau agreed to meet with her in an Aldi's parking lot. During their conversation in the parking lot, respondent displayed "a very different array of emotions." At one point, respondent "threw herself down on the ground and

was [lying] on the ground[,] crying." Then respondent "tried to engage [Moreau] in a physical fight."

¶ 11    After about 30 minutes, respondent calmed down enough that she and Moreau could have a conversation. Respondent denied using any drugs other than cannabis. She admitted, however, that she had "some mental health issues." According to respondent, she "had told people that she had [mental health issues], but nobody would ever help her."

¶ 12    This was the last time that Moreau had any contact with respondent other than in the shelter care hearing, when Moreau arranged for respondent to meet with her caseworker. Moreau did not know if respondent still resided in Forsyth.

¶ 13                    2. *The Testimony of Michael Dahl*

¶ 14    Michael Dahl believed that he was B.S.'s father, but he was awaiting the results of DNA testing to definitively establish his paternity. Dahl treated both B.S. and P.S. as his own daughters. Evidently, respondent regarded Dahl as B.S.'s father, for respondent had been accustomed to dropping off B.S. at his house to stay with him during weekends—although, lately, Dahl had not been receiving regular visits from B.S. as he would like.

¶ 15    Once, "before all the court stuff" happened, respondent dropped B.S. off on a Thursday, apparently thinking it was a Friday. Then Dahl ended up keeping B.S. for 10 days, without receiving any explanation or any communication from respondent. "She never called to check on her or any of that." That respondent had gotten her days mixed up and then had signed off for 10 days was not Dahl's only concern. When dropping off B.S. unexpectedly on that Thursday, respondent did not even bother to confirm that Dahl was home. Because Dahl had obtained a no-trespass order against respondent—the reason being that respondent had been driving to Dahl's house late at night and "trying to fight people" while B.S. was in the car—

respondent had been letting B.S. out of the car at some distance from Dahl's house. On the Thursday in question, respondent simply let B.S. out of the car, down the street, and then drove away without bothering to contact Dahl. It was only by sheer luck that Dahl was home.

¶ 16    Dahl was asked if he had talked with respondent about a safer method of transfer. He answered in the negative. "You can't talk to her," he explained. "She's got a very bad attitude. Anything you ask her or say to her, she's never wrong or—you know."

¶ 17    Their relationship had been tempestuous, largely because, according to Dahl, respondent had been an abuser and seller of controlled substances. In 2018, Dahl broke off his relationship with respondent, and obtained an order of protection against her, upon learning that his home was in danger of being raided. He testified: "I had to get an order of protection on her because she came home and attacked me because I found out from a family—friend of her family's that we were going to get raided." In fact, respondent was currently on probation for unlawful delivery of a controlled substance (as the State corroborated by presenting a certified copy of the conviction in Macon County case No. 19-CF-986). Seven months after Dahl required her to decamp, respondent, by threatening to kill herself, "coerced [him into] taking her back." Thereafter, they lived together until December 24, 2019, when, for the second time, Dahl insisted that respondent move out, this time because respondent had been showing up at his house late at night and trying to fight people while B.S. was in the car with her (the grounds of the no-trespass order).

¶ 18    The assistant state's attorney asked Dahl if, to his knowledge, respondent was using illegal substances. Dahl answered: "Well, she's got prescriptions that she don't have no more because she still takes those pills because she buys them off the street." Dahl had known respondent "for a long time," since 2011, and she had a longstanding problem with drugs. She had

been taking "Adderall, Vicodin, and other pain pills that [she had not been] prescribed." The guardian *ad litem* asked Dahl:

> "How do you know that she is taking pain medications that she is not prescribed?
>
> A. Because I've been—like I said, I've been with her for a long time. I know what she was taking, and I was finding other drugs in her purse and things like that and flushing them down the toilet.
>
> * * *
>
> Q. What did you observe, if anything, that would lead you to believe that [respondent] was under the influence of any substances?
>
> A. Well, I seen her passed out on the toilet multiple times with her pants down, sitting up, and different things like that and falling asleep while she's talking to somebody on the phone. ***
>
> * * *
>
> Q. When was the last time that you observed her in such a condition?
>
> A. Anytime she drives by my house.
>
> Q. I'm talking about when you were still a couple.
>
> A. When we were still a couple when was the last time I seen her?
>
> Q. Correct, in such a condition that she's either passed out—
>
> A. The last day that our relationship was.
>
> Q. And I think the testimony was you're not aware of her receiving any rehabilitation or substance abuse treatment?
>
> A. No."

¶ 19                    3. *The in Camera Examination of B.S.*

¶ 20    The circuit court attempted an *in camera* examination of B.S. She told the court that she was in second grade. Not much else of substance was discussed. After some pleasantries, the court decided, apparently on the basis of B.S.'s demeanor, that the *in camera* examination should end.

¶ 21                    4. *The Testimony of Carson S.*

¶ 22    Carson S. testified that she was B.S.'s aunt and also her foster parent. Carson no longer had a relationship with B.S.'s mother, respondent. Their relationship soured about the time that respondent broke up with Dahl. But Carson had not put respondent out of her mind, and she was far from indifferent toward her. She still saw respondent driving around Decatur all the time, usually in the company of others, and Carson received text messages and videos regarding respondent every day. Although Carson tried to keep informed about her sister, the last time she had a relationship with her was some four years ago. Since then, respondent had turned into a different person, mentally and physically. Respondent was at a loss to explain what had caused the change.

¶ 23    Carson had seen some bizarre videos of respondent, videos that had been mentioned in the shelter care hearing. Carson testified:

> "I've seen videos of [respondent] in her home in Forsyth being destructive and throwing things and screaming about pills and screaming about marijuana. I've seen videos of her riding around smoking weed with my niece in the car. I've seen videos of her fighting herself in the mirror.
>
>          Q. And you were able to positively identify this person that you saw as your sister?
>
>          A. Yes. Yes."

¶ 24 About five or six months ago—Carson could not remember the exact date, but it was a few months ago—she went to her sister's house in Forsyth and told her sister that she still loved her; that she just wanted her to get better; and that, if respondent ever needed help with B.S., Carson was always available. But the main reason why Carson went to respondent's house that day was that respondent had put up P.S.'s bed for sale—a bed that respondent had bought for $11,000. In fact, respondent was selling everything in the house. When Carson arrived, nothing was left in the house other than the beds and the kitchen table, and they were for sale. Carson's fiancé wanted to buy P.S.'s bed. Carson, too, wanted the bed, for her own daughter. Carson bought the bed from respondent for $600. Carson explained: "I knew that if I wouldn't have bought it, somebody else would have bought it."

¶ 25 The morning after Carson (or her fiancé through her) bought the bed from respondent, Carson received a disturbing phone call from respondent:

> "The next morning I woke up to getting screamed at and yelled at on the phone, and then before I know it, I have [respondent] and a black male driving past my house, and then a phone call from her telling me, [']Bang, bang, bitch. The next time I see you, I will shoot you and your kids.['] "

¶ 26 The record does not appear to specify what, if anything, provoked respondent to make this threat. On cross-examination, however, a question was raised of how Carson could bring herself to buy a bed that, presumably, someone in respondent's household—one of Carson's close relatives—would need to sleep on. Respondent's attorney asked Carson:

> "Are you aware that [respondent] was residing with her mother?
>
> A. No. She was living at the house in Forsyth.
>
> Q. So you purchased a bed, so she no longer has a bed to sleep on?

A. [B.S.] was living with my mother.

Q. But the $11,000 bed is [B.S.]'s bed?

A. Was [P.S.]'s bed, who she does not have, who lives with her grandmother.

Q. So you did not know that mother was living with grandma?

A. I know for a fact she wasn't living with grandma. I speak to grandma almost every day."

Dahl's attorney pursued this line of inquiry further:

"[Carson], I just want to ask a little bit about the living arrangements for the kids. You said that you were very familiar with grandma and where the kids may have been staying.

A. Yes.

Q. Do you know where the children, [P.S.] and [B.S.], were during the week?

A. During the week?

Q. Yes. During the week, who they were staying with?

A. Well, I would say 80 percent of the time [B.S.] would be with my mother, and then [P.S.] has lived with Tracy for almost three years now.

Q. Okay. And where were they during the weekends?

A. I don't know. My mom never told me that.

Q. So do you know if [B.S.] was, for example, with Mr. Dahl on the weekends?

"A. Yeah. I've heard that multiple times that [B.S.] would get dropped off at the corner at Mike's house and [B.S.] would have to walk up to the door and knock on the door, and that's coming out of [B.S.'s] mouth herself telling me that.

Q. And, as far as you know, in terms of the selling of the furniture and whatnot, it was the children's beds that were being sold?

A. Yes."

¶ 28                              5. *The Testimony of Erica Chevalier*

¶ 29        Erica Chevalier, called by respondent, was a child welfare specialist employed by Lutheran Child and Family Services (Lutheran). She was aware of the investigation in this case but had no involvement in it. "We just get the cases once they've handed it over to placement," Chevalier explained.

¶ 30        Respondent's attorney asked Chevalier if she were "aware as to the reason why the child [*sic*] was taken into care." Chevalier answered in the affirmative. She testified:

> "So it was a lot of, like, hearsay. There was drug speculation. There was [B.S.'s] involvement in, like, TikTok videos. Mom would drop the kids off; she never had them. Just speculation from whoever made the report."

¶ 31        By reviewing her medical records, Lutheran ascertained that respondent had been prescribed medications. The only drug, however, for which respondent had tested positive was cannabis—and she had "a marijuana prescription card." Since Chevalier had taken over the case, respondent's first drug test was September 2, 2020. In response to that information, the assistant state's attorney made a relevancy objection, which the circuit court sustained. (The children were taken into protective custody on July 23, 2020, and the petitions for adjudication of wardship were filed on July 27, 2020.)

¶ 32　　　　In addition to undergoing the drug testing that Lutheran had recommended, respondent went to St. Mary's Hospital for a mental health evaluation. Respondent's exhibit No. 1 was a record from St. Mary's Hospital that, according to her attorney's description to the circuit court, "reflect[ed]" that respondent had "[gone] and got a psychiatric evaluation." (That description, incidentally, does not appear to be quite accurate. It is true that respondent's exhibit No. 1 is a record from the emergency department of St. Mary's Hospital stating that on July 24, 2020, respondent "[p]resented to the [emergency department] with agitation" because "[e]vidently DCFS took her kids and they wanted some documentation [that the] patient is psychologically competent." Under "Psychiatric/Behavioral," however, the only finding that Dr. Hamid Reza Sagha made was "Positive for agitation." We see no indication that Dr. Sagha was a psychiatrist. Apparently, he was just the emergency department physician. Nor do we see any indication—at least from the adjudicatory hearing—that a psychiatric evaluation, properly speaking, was performed. But a drug test was performed, according to this exhibit, and respondent tested positive for cannabinoids but negative for cocaine metabolites, methamphetamine, amphetamine, opiates, benzodiazepines, and everything else.)

¶ 33　　　　　　　6. *The Judicial Findings of Neglect and Abuse*

¶ 34　　　　At the conclusion of the adjudicatory hearing, the circuit court found Moreau's testimony to be credible and Carson's testimony to be "especially credible." On October 1, 2020, the court entered two adjudicatory orders, one in B.S.'s case and the other in P.S.'s case. In the adjudicatory orders, the court found B.S. and P.S. to be "neglected" within the meanings of sections 2-3(1)(a) and (b) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3(1)(a), (b) (West 2018)) and "abused" within the meaning of section 2(ii) of the Act (*id.* § 2-3(2)(ii)). The

court based the findings of neglect and abuse on respondent's "substance abuse [and] mental health issues."

¶ 35                 B. The Consolidated Dispositional Hearing

¶ 36                 1. *Chevalier's Recommendations*

¶ 37       On October 29, 2020, in the consolidated dispositional hearing, one witness was called: Chevalier. The State was the party that called her. On the one hand, Chevalier recommended that the children be made wards of the court and that DCFS be made their guardian, with the discretion to give respondent unsupervised, overnight weekend visitation. On redirect examination, the prosecutor asked Chevalier, "What about [P.S.]?" Chevalier answered, "I believe that it is in [P.S.'s] best interest to stay with her paternal grandmother as that's where she has been."

¶ 38       On the other hand, however, respondent's attorney asked Chevalier, "Do you have any concern if [B.S.] be returned to her mother today?" and, paradoxically, Chevalier answered:

"No.

Q. And do you have an opinion that it is in the best interest of [B.S.] to be returned to her mother today?

A. I think it is in the best interest for her.

Q. Could you elaborate as to your reason?

A. Just the investigation was a lot of hearsay, and I just feel like [B.S.] was—[B.S.] was fine where she was at. I can't confirm or deny anything that happened in the past, but she's exhibited none of those behaviors with us, [respondent] hasn't."

Chevalier had visited respondent's home and had found therein furniture, beds, and food. B.S. had a room in respondent's home, and the home was safe. Respondent now had a job. She was "compliant in everything [that Lutheran had] asked" of her. She had "improved, actually," and was "doing her services." Visitations, supervised by respondent's mother, were going well. Beginning in early September 2020, respondent began undergoing toxicology screens every Monday, Wednesday, and Friday, and they all had come back negative (although, Chevalier admitted, respondent knew ahead of time when a toxicology test would be administered). Respondent had undergone a mental health assessment, and counseling was recommended, but respondent had not started the counseling yet—through no fault of her own: counseling could not begin until the report of the integrated assessment was written. Both respondent and Dahl (who was still awaiting the DNA results) had participated in an integrated assessment, and for the time being Lutheran had recommended only four services. The services were for respondent alone: the mental health assessment, counseling, the substance abuse assessment, and toxicology screens.

¶ 39        On cross-examination by the guardian *ad litem*, Chevalier admitted that additional services could yet be recommended for respondent, depending on the results of the integrated assessment. It was possible, for example, that a parenting course could be recommended for respondent. The guardian *ad litem* continued:

> "And we've got about two months['] worth of clean screens?
>
> A. (No verbal response.)
>
> Q. I didn't—is that yes?
>
> A. Yes.
>
> Q. Okay. And with all of the limited—and we did have a contested hearing on this, correct?

A. We did.

Q. And the Court determined the child was neglected and abused, correct?

A. Yes.

Q. So without knowing for sure what services are required and two months['] worth of sobriety, you believe it's safe and in the best interest to return this child back to the mother?

A. So I looked at the investigation—

Q. I just want to know if it's a yes or no?

A. Well then, yes."

¶ 40              2. *A Change of Foster Parents for B.S.*

¶ 41       B.S.'s aunt, Carson, was originally her foster parent. B.S. was removed, however, from her aunt's custody, and was placed in a different foster home, because of a report that Carson had made B.S. "do jumping jacks as a form of punishment" (to quote from Chevalier's testimony). The incident was investigated, and the report was determined to be "unfounded." The guardian *ad litem* asked Chevalier:

"Was the child returned back to her care?

A. No.

Q. Why not?

A. Because [Carson] wasn't technically supportive of the goal and also because per policy and procedure if she wasn't there for 90 days, we didn't have to return her back."

¶ 42              3. *The Circuit Court's Dispositional Decisions*

¶ 43        At the conclusion of the consolidated dispositional hearing, the circuit court complimented respondent for her prompt progress thus far. "Two months of sobriety based on three tests per week is a big accomplishment," the court told her. Nevertheless, the court "ha[d] to feel comfortable in [its] own mind" that returning the minors home would be in their best interests:

> "And while I commend you on one hand, I think we have to see a little bit longer period of sobriety, get that integrated assessment report out and see what services you need, if any, and go from there.
>
> *** [H]opefully, we'll get the integrated assessment done quickly and we can get your services started and we're willing to move through the case at a pretty rapid pace ***."

¶ 44        The circuit court made the children wards of the court and appointed DCFS as their guardian, granting DCFS the "discretion to permit unsupervised, overnight, and extended visitation."

¶ 45        These appeals followed.

¶ 46                                II. ANALYSIS

¶ 47                A. An Environment Injurious to the Children's Welfare

¶ 48        The circuit court found B.S. and P.S. to be "neglected" within the meaning of two subsections of section 2-3 (*id.* § 2-3(1)(a), (b)) and "abused" within the meaning of another subsection (*id.* § 2-3(2)(ii)). We need not review all of those findings. "Only a single ground for neglect need be proven, and thus when the circuit court has found a minor neglected on several grounds, we may affirm if any of the circuit court's bases of neglect may be upheld." *In re Faith B.*, 216 Ill. 2d 1, 14 (2005). We choose to review the findings that B.S. and P.S. were "neglected"

within the meaning of section 2-3(1)(b) (705 ILCS 405/2-3(1)(b) (West 2018)) in that their environment was injurious to their welfare.

¶ 49 We acknowledge that a parent's mental illness or drug addiction does not automatically and categorically make a child neglected. Rather, such a condition makes a child neglected only if it creates an environment injurious to the child's welfare. See *Faith B.*, 216 Ill. 2d at 14; *In re Z.Z.*, 312 Ill. App. 3d 800, 805 (2000). We also acknowledge that "a minor shall not be considered neglected for the sole reason that the minor's parent *** ha[s] left the minor in the care of an adult relative for any period of time, who the parent *** know[s] is both a mentally capable adult relative and physically capable adult relative." 705 ILCS 405/2-3(1)(a) (West 2018); see also *id.* § 1-3(12.1) (defining " '[p]hysically capable adult relative' "). It was never suggested that either B.S.'s grandmother or P.S.'s grandmother was mentally or physically incapable of taking care of a child.

¶ 50 With those pitfalls pointed out and avoided, we consider the finding that B.S. and P.S. were "neglected" within the meaning of section 2-3(1)(b) in that their "environment [was] injurious to [their] welfare" (705 ILCS 405/2-3(1)(b) (West 2018)). We owe this finding "great deference." (Internal quotation marks omitted.) *In re Tyianna J.*, 2017 IL App (1st) 162306, ¶ 51. It is not for us to decide whether the State proved its claim by a preponderance of the evidence (see *Faith B.*, 216 Ill. 2d at 13), that is, the claim that B.S. and P.S. were in an environment injurious to their welfare (see 705 ILCS 405/2-3(1)(b) (West 2018)). Instead, the question for us is whether the State clearly failed to prove its claim. "On appellate review, a trial court's finding of neglect must stand unless it is against the manifest weight of the evidence—if the opposite conclusion is clearly evident." (Internal quotation marks omitted.) *Faith B.*, 216 Ill. 2d at 13-14.

¶ 51 Considering that shots were fired from a car occupied by B.S., it is not clearly evident that the State failed to prove an environment injurious to her welfare. Moreau testified: "It was reported that there was—while [B.S.] was in the car that there were shots fired in the vehicle that Mom was driving. A source came forward that was in the car when this occurred and confirmed it, as well as [B.S.] reporting it to another person, the aunt." Respondent's attorney—not the assistant state's attorney but respondent's attorney—remarked that the statements that Moreau recounted in her testimony were "[n]ot offered for proof [*sic*]." But the State, rather than respondent, was the proponent of this evidence, and the unilateral assumption of respondent's attorney did not bind the State. All evidence is offered as proof of something, and evidence that is not expressly limited is admitted substantively, making it "available for all purposes" (*People ex rel. Sherman v. Cryns*, 321 Ill. App. 3d 990, 993 (2001)).

¶ 52 To be sure, the quoted testimony by Moreau was hearsay. The testimony recounted "statement[s], other than one[s] made by the declarant[s] while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ill. R. Evid. 801(c) (eff. Oct. 15, 2015) (definition of hearsay). The rules of evidence apply to adjudicatory hearings (705 ILCS 405/2-18(1) (West 2018)), and hearsay is inadmissible unless a supreme court rule or a statute carves out an applicable exception (Ill. R. Evid. 802 (eff. Jan. 1, 2011)). Hearsay, however, has to be objected to specifically and expressly on that ground (*e.g.*, "Objection. Hearsay.") Respondent's attorney made only a general objection, that is, an objection without specifying any ground. A general objection is interpreted only as an objection on the ground of irrelevancy and forfeits any other ground, including the ground of hearsay. *People v. Villanueva*, 382 Ill. App. 3d 301, 304-05 (2008).

¶ 53        "It is well established that when hearsay evidence is admitted without an objection, it is to be considered and given its natural probative effect." *Jackson v. Board of Review of Department of Labor*, 105 Ill. 2d 501, 508 (1985). A reasonable trier of fact could give Moreau's testimony its natural and probative effect. On the basis of Moreau's testimony, a reasonable mind could believe that B.S. was riding in a car driven by her mother when someone in the car repeatedly discharged a firearm. An aura of violence seems to surround respondent. Dahl testified that respondent had been driving to his house and trying to get in fights with people while B.S. was in the car with her. It is lucky that no one drew a pistol. Carson testified that respondent had told her, " ['], Bang, bang, bitch. The next time I see you, I will shoot you and your kids.['] " As of the time of the adjudicatory hearing, respondent was still on probation for unlawful delivery of a controlled substance, a line of work that could lead to encounters with rough individuals. All in all, then, it is not clearly evident that the State failed to prove respondent's breach of her duty to ensure a safe and nurturing environment for B.S. See *In re Arthur H.*, 212 Ill. 2d 441, 463 (2004).

¶ 54        Almost no evidence was adduced, however, regarding P.S. She was scarcely mentioned. Even so, P.S. could be found to be neglected under a theory of anticipatory neglect. See 705 ILCS 405/2-18(3) (West 2018) (providing that "proof of the *** neglect *** of one minor shall be admissible evidence on the issue of the *** neglect *** of any other minor for whom the respondent is responsible"). A theory of anticipatory neglect "seeks to protect not only children who are the direct victims of neglect or abuse, but also those who have a probability to be subject to neglect or abuse because they reside, or in the future may reside, with an individual who has been found to have neglected or abused another child." *In re Tamesha T.*, 2014 IL App (1st) 132986, ¶ 42. Although P.S. lived with her grandmother, P.S. could in the future reside with respondent, her mother, or could ride in a car with her. While in respondent's custody, P.S. would

be subjected to the same unsafe environment as B.S. A court need not wait until P.S. likewise is exposed to gunfire. See *id.* A finding of anticipatory neglect as to P.S. would be defensible. See *id.* ¶ 31.

¶ 55                                B. The Dispositional Orders

¶ 56        If the State satisfies its burden of proving negligence, "the circuit court must then proceed to the second adjudicatory stage, in which the court determines whether 'it is consistent with the health, safety[,] and best interests of the minor and the public that he [or she] be made a ward of the court.' " *Arthur H.*, 212 Ill. 2d at 464 (quoting 705 ILCS 405/2-21(2) (West 2000)). "On review, the trial court's dispositional decision will be reversed only if the findings of fact are against the manifest weight of the evidence or the trial court committed an abuse of discretion by selecting an inappropriate disposition." *In re J.C.*, 396 Ill. App. 3d 1050, 1060 (2009).

¶ 57        For the following reasons, respondent challenges the dispositional orders. Chevalier, in her interactions with respondent, has seen none of the behaviors that were described in the adjudicatory hearing. Respondent has been fully compliant with the agency's recommendations. Her cooperation has been absolute. She has faithfully undergone all of the scheduled drug testing—three times a week, no less—and each test has come back negative. She is employed. She has a furnished home that is stocked with food—a home that, in Chevalier's opinion, is perfectly safe. Chevalier, the State's own witness in the dispositional hearing, believes that it would be in the best interest of the children to return them to respondent's custody immediately. Respondent maintains that, "[b]ased on the total lack of evidence, the [circuit] court's decision to make the minors wards of the court is against the manifest weight of the evidence[ ] and the decision should be reversed." Likewise, respondent contends that "the court's decision to grant guardianship to DCFS was against the manifest weight of the evidence."

¶ 58    As we have noted, the manifest-weight-of-the-evidence standard applies to the circuit court's factual findings. See *id.* What, then, were the court's factual findings in the dispositional hearing? They were that (1) respondent had demonstrated sobriety for only two months and (2) the results of the integrated assessment were still pending. Those findings are not against the manifest weight of the evidence. Arguably, two months of sobriety, though encouraging, are not enough from which to draw any firm conclusion. Arguably, it would make sense to await the recommendations of the integrated assessment, to see if there are any additional conditions that would prevent the return of the children.

¶ 59                                    III. CONCLUSION

¶ 60    For the foregoing reasons, we affirm the circuit court's judgments in the two cases.

¶ 61    Affirmed.